IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | )Case No. 3:14-cr-00224-JO |
| | ) |
| v. | ) |
| | ) |
| MARK PATRICK JOHNSON, | ) December 4, 2014 |
| | ) |
| Defendant. | ) Portland, Oregon |
| _____ | ) |

MOTION HEARING

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ROBERT E. JONES

UNITED STATES DISTRICT COURT SENIOR JUDGE

```
1                              APPEARANCES

2    FOR THE PLAINTIFF:     LEAH K. BOLSTAD
                            United States Attorney's Office
3                           1000 SW Third Street
                            Suite 600
4                           Portland, OR 97204

5

6    FOR THE DEFENDANT:     PHILIP A. LEWIS
                            Attorney at Law
7                           210 SW Morrison Street
                            Suite 500
8                           Portland, OR 97204

9

10   COURT REPORTER:        Jill L. Erwin, CSR, RMR, RDR, CRR
                            Certified Shorthand Reporter
11                          Registered Merit Reporter
                            Registered Diplomate Reporter
12                          Certified Realtime Reporter

13                          United States District Courthouse
                            1000 SW Third Avenue, Room 301
14                          Portland, OR 97204
                            (503)326-8191
15

16                              *   *   *

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2   WITNESSES:                                      PAGE:

3   JIM MACNAIR

4   Direct Examination                                7

5   Cross-Examination                                22

6   Redirect Examination                             25

7   JOSEPH CORONA

8   Direct Examination                               26

9   Cross-Examination                                58

10  Redirect Examination                             70

11  ADAM SWAIL

12  Direct Examination                               76

13  Cross-Examination                                88

14  Redirect Examination                             93

15  CORY STENZEL

16  Direct Examination                               95

17  Cross-Examination                               106

18  Redirect Examination                            108

19

20

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

THE COURT:  Good morning, everybody.

MR. LEWIS:  Good morning, Your Honor.

MS. BOLSTAD:  Good morning, Your Honor.
Leah Bolstad for the United States.  We're here in the
matter of United States v. Mark Patrick Johnson.  Case
No. 14-224.  The defendant is present -- he is represented
by counsel, Mr. Phil Lewis, and we're here for a hearing on
the defendant's motions to suppress and motion for a *Franks*
hearing, as well as a pretrial conference for a trial date
December 18, 2014.

THE COURT:  Okay.  We went through this in the
prior case, as to a request for a *Franks* hearing, and, by
the time we got through an offer of proof, we virtually had
a *Franks* hearing.  It does become kind of a moot issue.  The
defense wants to put on -- challenge certain matters.
You've conceded.  I just received a substantial number of
your concerns.

Have you had a chance to digest what the government has
conceded?

MR. LEWIS:  This morning, Your Honor.

THE COURT:  Yeah.

MR. LEWIS:  I've had a chance to read about half
of the memorandum.  I have not had a chance to look at.

THE COURT:  Well --

1          MR. LEWIS:  I just received it while I was walking

2     over here.

3          THE COURT:  Well, the -- there's a lot -- why

4     don't we just take time for you to read it.

5          MR. LEWIS:  Okay.

6          THE COURT:  Because, otherwise, it will just be --

7     a lot of what you are concerned about, the government agrees

8     with and has offered to tone down and neutralize certain

9     evidence that might have a prejudicial effect.  So let's

10    just take another 10, 15 minutes.

11         MR. LEWIS:  I think it might take less.  I can

12    advise the court staff once I'm done.  We can resume then,

13    unless the Court want to stay here.

14         THE COURT:  That will be even fine.  Go ahead.

15    We'll just be in recess until I get your call.

16         MR. LEWIS:  Thank you, Your Honor.

17         THE COURT:  Thank you.  Actually, I might stay

18    here and look at some stuff.

19       Do you have the physical exhibits here today, or are

20    you just going to make reference to them?

21         MR. LEWIS:  I do have them, Your Honor.  I would

22    be happy to show the Court the exhibits if it would make it

23    easier.  At this point they are mainly photographs of the --

24    there's a map that may or may not be offered.

25         THE COURT:  Okay.  Continue to look.  Go ahead.

1          (Pause-in-proceedings.)

2          MR. LEWIS:  Your Honor, I'm prepared to proceed.

3          THE COURT:  You've read them?

4          MR. LEWIS:  I have, Your Honor.

5          THE COURT:  Okay.  Thank you.  In respect to this

6    matter, do you have a preference as to how to proceed with

7    your motions?

8          MR. LEWIS:  Well, with respect to the motions to

9    suppress or the evidentiary issues here.

10         THE COURT:  Let's talk about the motion to

11   suppress first.

12         MR. LEWIS:  Oh, yes, Your Honor, my preference

13   would be to call the witnesses and get that out of the way,

14   and then we can deal -- because those pertain to both the

15   suppression issue and to the *Franks* motion, we can take care

16   of both right then and there.

17         THE COURT:  Yeah.  The situation is we're going to

18   have the same evidence whether it's to see if you've got

19   enough evidence for a *Franks* hearing -- by the time we've

20   done that, we've conducted a *Franks* hearing, virtually.

21         MR. LEWIS:  I think I'm agreeing with the Court,

22   Your Honor.  So it makes sense -- I think it makes sense to

23   call the witnesses, and we have that taken care of.

24         THE COURT:  Okay.  And in respect, do you want to

25   call them yourself or have the government --

Macnair - D

1          MR. LEWIS:  Oh, I have a person who's not a police

2    officer who's my first witness.  I'm prepared to call him

3    right now.

4          THE COURT:  That would be fine.

5          MR. LEWIS:  And that's Jim Macnair.  Mr. Macnair.

6

7                    JIM MACNAIR,

8    called as a witness in behalf of the Defendant, being first

9    duly sworn, is examined and testified as follows:

10         DEPUTY COURTROOM CLERK:  Go ahead and take a seat.

11   State your name and spell your last for the record.  You may

12   be seated.

13         THE WITNESS:  My name is James Macnair.  Last name

14   is spelled M-A-C-N-A-I-R.

15

16                 DIRECT EXAMINATION

17   BY MR. LEWIS:

18   Q.   Mr. Macnair, what do you do for a living?

19   A.   I design knives for Kershaw Knives down in Tualatin.

20   Q.   And for how long have you been working for Kershaw?

21   A.   I've been working there for four years.

22   Q.   And have you worked for another knife company prior to

23   that?

24   A.   I have, yes.

25   Q.   What kind of work?

Macnair - D

1   A.   Designer work, as well.

2   Q.   What is your educational background?

3   A.   I have a BFN in industrial design.  Product design.

4   Q.   And where is that from?

5   A.   That's from Brigham Young University.

6   Q.   Are you familiar with the different kinds of knives

7   that are manufactured and sold by Kershaw?

8   A.   I am.  And I've designed all the different styles that

9   we -- that we currently sell and manufacture.

10  Q.   And does Kershaw manufacture and sell what we refer to

11  as folding knives?

12  A.   We do, yes.

13  Q.   Are these sometimes referred to as pocketknives?

14  A.   They are, yes.

15  Q.   Are you familiar with the Ken Onion Model 1830?

16  A.   I am, yes.

17       MR. LEWIS:  Your Honor, I apologize.  I forgot to

18  ask Ms. Bolstad if she had the property that was to be

19  brought in today by Portland Police Bureau.

20       Do you have that?

21       MS. BOLSTAD:  I do.

22       MR. LEWIS:  Do you have it handy?

23       MS. BOLSTAD:  I do.

24       MR. LEWIS:  I beg your pardon, Your Honor.

25       THE COURT:  Can you get it, please?

Macnair - D

1          MS. BOLSTAD:  Yes.

2          MR. LEWIS:  The two pocketknives.

3          MS. BOLSTAD:  This might take just a moment,

4    Your Honor.

5          THE COURT:  Take your time.

6          MR. LEWIS:  Thank you, Your Honor.  May I approach

7    the witness with this item?

8          THE COURT:  Of course.

9          MR. LEWIS:  I would like to mark it, as best I

10   can, as Exhibit 19.  Defense Exhibit 19.

11         THE WITNESS:  Thank you.

12   BY MR. LEWIS: (Continuing)

13   Q.   Mr. Macnair, I'm handing you a knife.  Don't open it up

14   right now.

15   A.   Okay.

16   Q.   Do you recognize that as a Kershaw Model 1830?

17   A.   I do, yes.

18   Q.   And you're familiar with that knife?

19   A.   I am very much so.

20   Q.   Is that a folding knife?

21   A.   It is, yes.

22   Q.   And is that generally made to be carried in one's

23   pocket?

24   A.   It is, yes.

25   Q.   About how long is the blade?

Macnair - D

1   A.   The blade on this knife is about three inches long.

2   Q.   And for whom are these blades marketed?

3   A.   We market these knives to average consumers for

4   something we refer to as everyday carry.  We generally

5   intend for people to use them for tasks like cutting strings

6   off of their clothing, opening mail, opening packages; the

7   average things one would use a folding pocketknife for.

8   Q.   Do sportsmen use it?

9   A.   That's correct, yes.

10  Q.   People use it to open cardboard boxes, and the like, at

11  work?

12  A.   Yes.

13  Q.   Does that knife open with a push of a button or by

14  releasing a spring?

15  A.   It does not, no.

16  Q.   How does it open?

17  A.   It opens by manual pressure.  May I now demonstrate?

18  Q.   If that's okay with the Court.

19       THE COURT:  Certainly.  Go ahead.

20       THE WITNESS:  So this knife has a mechanism that

21  we refer to as SpeedSafe, as our tradename.  It is an

22  assisted opening mechanism, and there's a significant

23  difference between an assisted opening knife and what has

24  been termed the switchblade or an automatic knife.  We

25  encounter this frequently.

Macnair - D

1    So the mechanism that this knife uses is similar to the

2    kickstand on a bicycle.  I -- I'm going to assume that most

3    of the court has ridden a bicycle before.  But the kickstand

4    on a bicycle has a -- has a -- has a mechanism where when

5    you push it a certain distance it wants to open, but if you

6    push it back a certain distance, it also wants to pull

7    itself to the closed position.  And these knives operate in

8    a very similar fashion.

9    So they have what is called a torsion bar inside of the

10   handle.  It's a bent piece of steel.  And it actually

11   functions in two directions.  So when the knife is in a

12   closed position here, it actually has what we refer to as a

13   bias towards closure.  That means that right now the torsion

14   bar on the handle is making that knife want to close, which

15   I can exhibit by pushing upward.  You can see I'm actually

16   going against gravity here, and this knife will actually

17   draw itself shut.

18   So, in that case, what this requires you to do, the

19   user is actually required to grab this little piece of the

20   blade here.  This is actually a protrusion that is part of

21   the blade itself, and they pull that with their finger.

22   And you can see, as I slowly open it, that there's a

23   point at which you have to actually overcome that bias

24   towards closure.

25   ///

Macnair - D

1   BY MR. LEWIS: (Continuing)

2   Q.   And does that knife -- does the blade of that knife

3   open or project into position by the force of a spring or

4   centrifugal force?

5   A.   No.   It opens by manual pressure from the user.

6          MS. BOLSTAD:   Your Honor, I have a question in aid

7   of objection.

8          THE COURT:   Well, all right.

9          MS. BOLSTAD:   Is this the knife that was seized in

10  2014 that this case is based on?

11         MR. LEWIS:   I'm sorry.   I think this is -- this

12  is -- I thought we could -- I should have brought this up by

13  stipulation.   I assume counsel took this out of the bag that

14  was -- that's the knife that was seized in 2009.

15         MS. BOLSTAD:   It is.   And, Your Honor, I'll object

16  to this line of questioning as to 2009.   It is irrelevant to

17  this case.

18         THE COURT:   Well, what is relevant to this case?

19  We have a knife.

20         MS. BOLSTAD:   And that's not it.

21         THE COURT:   Where is it?

22         MS. BOLSTAD:   It was seized in 2014, and I have it

23  here in my bag.

24     Defense is asking questions about a knife seized in

25  2009.

Macnair - D

1          MR. LEWIS:  Your Honor, I've made it very clear in

2      my pleadings that 2009 is highly relevant in this case

3      because the 2014 search warrant was based, to a large

4      degree, on evidence seized in 2009.  The 2009 search was

5      illegal for a number of reasons.  One of which was the basis

6      for the arrest itself was illegal.  And in order to

7      establish that, I need this testimony to show that.

8          That's why it's relevant.  That's why 2009 is relevant.

9          THE COURT:  All right.  You can proceed.

10         Let's get the other knife out, too.

11         MR. LEWIS:  Yes.

12         THE COURT:  I figure you'll go into that.

13         MR. LEWIS:  I will be, Your Honor, yes.

14         THE COURT:  That's fine.

15     BY MR. LEWIS: (Continuing)

16     Q.   If this were a -- the other kind of a knife that opens

17     by force of a spring, how would that operate?  How would

18     that be different?

19         THE COURT:  Is that what we have over here?

20         MR. LEWIS:  No.  No.  It's the opposite.

21         THE COURT:  Well, let's get both knives up here so

22     I can see what we're talking about.

23         MR. LEWIS:  Let mark that.  Thank you very much,

24     Your Honor.

25     ///

Macnair - D

1  BY MR. LEWIS: (Continuing)

2  Q.   Mr. Macnair, I'm handing you what's marked as Defense

3  Exhibit 20.  Do you recognize that?

4  A.   I do.  Actually, if I may say, this is a knife that I

5  designed myself.  Designed and engineered.

6  Q.   What model is it?  Does that have a model number of

7  some sort?

8  A.   It does.  It's the Kershaw Model 1990.

9        MR. LEWIS:  And can counsel agree that this is the

10  knife seized in 2014?

11        MS. BOLSTAD:  Agreed.

12        THE COURT:  What are the differences?

13        THE WITNESS:  Your Honor, to clarify, both of

14  these knives are what we term assisted opening knives.  What

15  we're comparing these to is what would be considered a

16  switchblade.  So we're arguing that neither of these knives

17  is a switchblade.  And so my testimony is meant to clarify

18  the differences between these two knives, which are assisted

19  opening knives and what's commonly known as a switchblade,

20  which is prohibited by law.

21        THE COURT:  How does that one work; this second

22  one?

23        THE WITNESS:  This one here actually works in the

24  same way as the first one.

25        THE COURT:  What's the difference, is my question.

Macnair - D

1   What is the difference between the two knives?

2            THE WITNESS:  Appearance, mainly.

3            THE COURT:  Okay.  Explain that.

4            THE WITNESS:  Okay.  So this knife from 2009 is

5   a -- is a Kershaw Model 1830.  It has what we refer to as a

6   drop-point blade.  You can see it's got a -- it's got a

7   different overall appearance, but the mechanism is the same

8   basic mechanism.  It has a torsion bar in the handle and

9   it's that same kind of mechanism I described previously

10  where it works like a bicycle kickstand.  So the knife, once

11  you pivot to a certain point, actually wants to pull itself

12  closed.  And once you rotate it, once the -- once the --

13  once the user uses manual pressure to push the blade to

14  about 30 degrees rotation, that -- that torsion bar reverses

15  its action and wants to assist the user in opening the

16  blade.

17           THE COURT:  Go ahead.

18           THE WITNESS:  Okay.

19           MR. LEWIS:  Thank you, Your Honor.

20           THE COURT:  Well, wait a minute.

21           MR. LEWIS:  I'm sorry.

22           THE COURT:  I'm waiting to get the comparison.

23  You said "by appearance."

24           THE WITNESS:  So, functionally, these knives are

25  both the same.  This one has what we refer to as a tanto

Macnair - D

1    blade.  It has a different shape to it.  It has a different

2    shape to the handles.  They both actually are functionally

3    the same.  They're both what we refer to as a liner lock.

4    It has a bent steel -- has a bent steel liner inside that

5    goes behind the blade and keeps it from closing.  It allows

6    it to lock open, so it doesn't close on the user's hand.

7         They both have -- they both have what we refer to as a

8    pocket clip.  This allows the -- this allows the owner of

9    the knife to put it in their pocket, and this clip will hook

10   onto the material of the pants to keep the pocketknife from

11   falling out.

12            THE COURT:  Thank you.

13   BY MR. LEWIS: (Continuing)

14   Q.   Would it be fair to say that the differences between

15   the -- between the two knives are largely esthetic?

16   A.   That's correct, yes.

17   Q.   You mentioned that you had a tradename for the

18   technology that you use.  What is that tradename?

19   A.   We refer to as a SpeedSafe.

20   Q.   And I'd like to show you some photographs, if I could.

21   Let's see if they show up on the screen.  I need to make

22   this thing go up.

23        Well, this is good.  Do you see the picture on your

24   screen?

25   A.   I do, yes.

Macnair - D

1    Q.    And what do these depict?

2    A.    The knife on the top depicts what would be called an

3    automatic knife or a switchblade, and the knife on the

4    bottom is what we would refer to as a SpeedSafe knife or

5    assisted opening knife.

6    Q.    And this has been marked as Exhibit No. 14.  Do you see

7    the --

8    A.    I do.  Yes, I see.

9    Q.    I'd like to show you what's been marked Exhibit 15.

10   And what does this depict?

11   A.    The image on the top, again, depicts the -- depicts an

12   automatic knife or a switchblade.  And the image on the

13   bottom depicts the torsion bar mechanism that's inside of

14   the handle of what we refer to as an assisted opening knife

15   or a SpeedSafe knife.

16   Q.    And 16, what does that depict?

17   A.    So this image depicts the differences in the -- in the

18   operating mechanisms of those two knives.  Only they're

19   reversed now.

20          So the image on the top, it shows the torsion bar that

21   operates an assisted opening knife, and the image on the

22   bottom of Defendant's Exhibit 16, a little smaller, is what

23   we refer to as a coil spring, which is a constant force

24   spring that would operate an automatic knife or a

25   switchblade.

Macnair - D

1  Q.   You said a moment ago that you were likening the

2  SpeedSafe technology of the torsion bar mechanism like a

3  kickstand.

4  A.   That's correct.

5  Q.   Do you have another kind of analogy that you would

6  describe, an automatic knife, that uses a coil spring?

7  A.   I do.  And that -- so I bet that this is a bit of a

8  folksy comparison, but an automatic knife, in function, is a

9  knife where when you close the blade it's -- that spring is

10 under constant force all the way into the closed position,

11 and the only thing keeping it closed is a small catch, that

12 button that you press, which then releases that blade that's

13 under tension and it flies open.

14      The assisted opening knife, as we said, will tend to

15 use what we call a torsion bar, which up to a certain point

16 wants to assist the user in pushing the blade open.  But as

17 we -- as we reach about 30 degrees towards the closed

18 position, it actually -- you can see there actually much

19 better with this knife.  It reaches a point where it

20 actually wants to pull the knife shut.

21 Q.   So --

22 A.   So my -- I apologize.  That sets up my analogy a little

23 better.

24      So a switchblade or an automatic knife is much like a

25 racehorse who wants to go, and you have to hold onto the

Macnair - D

1  reins to keep that horse from going.  Once you release the

2  reins, that horse runs off; whereas, an assisted opening

3  knife is more like a mule, where it's a little more

4  stubborn.  You have to actually give it a push.  And once

5  you give it a push, that mule will take off and run or walk

6  on its own.

7  Q.   Mr. Macnair, if the knife were the racehorse, would

8  that then be having a blade that swings open by force of

9  spring?

10  A.   That's correct, yes.

11  Q.   One last picture I'd like to show you has been marked

12  Exhibit 17.  Do you see that there on your screen?

13  A.   I do, yes.

14  Q.   What does that depict?

15  A.   That depicts the method of operating both an automatic

16  knife and an assisted opening knife.

17  Q.   And how are they different?

18  A.   If you look at the string of images on the top of the

19  screen, the automatic knife has a button.  The user grasps

20  the knife in the hand, presses the button with their thumb,

21  and releases the blade.  And the blade extends to the fully

22  open position.

23  Q.   And that's the button right there that you're referring

24  to?

25  A.   That's correct, yes.

Macnair - D

1  Q.   And the other one is -- is that the knob right there on

2  the knife, like what you have right now?

3  A.   That's correct.  That would be the protrusion of the

4  blade itself.

5  Q.   Okay.

6  A.   So the -- in -- in that lower image, the user actually

7  has to push on the blade themselves.  The blade wants to

8  remain closed, because it's actually pulling itself shut,

9  and the user has to overcome what we refer to is that bias

10 towards closure, and that's, as I said, at about 30 degrees

11 of rotation, that mechanism reverses on itself, and it

12 assists the user in opening the knife.

13 Q.   Thank you.  A couple more things.

14      Mr. Macnair, does Kershaw describe its knives on its

15 website?

16 A.   We do, yes.

17 Q.   And are you familiar with the general content of the

18 website?

19 A.   I am, yes.

20           MR. LEWIS:  If I could approach the witness one

21 more time, Your Honor?

22           THE COURT:  Anytime.  You don't have to ask.

23           MR. LEWIS:  Thank you, Your Honor.

24 BY MR. LEWIS: (Continuing)

25 Q.   I'm handing you what's been marked Defense Exhibit

Macnair - D

1  No. 18.

2  A.    Okay.  I see that.

3  Q.    Do you recognize that?

4  A.    I do, yes.

5  Q.    What is it?

6  A.    This is a description of the SpeedSafe assisted opening

7  mechanism that we -- that we use on our website.

8  Q.    Does that or does any -- has any Kershaw website,

9  describing this product, describe their knives as being

10  activated by a spring?

11  A.    No, we do not.

12  Q.    Has Kershaw gone to some length to explain to the

13  public that these are not such knives?

14  A.    We have, yes.

15        THE COURT:  Are not what knives?

16        MR. LEWIS:  Are not such knives.  They're not

17  knives that are activated by a spring.

18     I have no other questions, Your Honor, I would offer

19  Defense Exhibits 16, 17 -- sorry.  14 through 17, 18, 19,

20  20.

21        THE COURT:  Very well.  They'll be received.  You

22  wish to ask questions for the government?

23        MS. BOLSTAD:  Yes, Your Honor.

24        THE COURT:  Please go ahead.

25  ///

Macnair - X

CROSS-EXAMINATION

1

BY MS. BOLSTAD:

2

Q.    Mr. Macnair, I couldn't tell at the end there.  I think

3

the question was, is -- does your company tell the public

4

that Kershaw knives are not assisted by a spring?

5

A.    We -- we make it clear to the public that it is not a

6

switchblade.

7

Q.    And so some of your knives are operated by force of a

8

spring?

9

A.    We don't currently manufacture any -- any knives that

10

we term as switchblades.  We have in the past.

11

Q.    That's not the question, sir.  The question is not

12

about switchblades.  I'm not using the term "switchblade."

13

A.    Okay.

14

Q.    The question is:  Do your knives, some of them, contain

15

springs?

16

A.    They contain what's called a torsion bar, which is a

17

form of a spring, yes.

18

Q.    It's a form of a spring, okay.

19

      So everything you just testified about the 1990 Kershaw

20

torsion bar is a form of a spring; correct?

21

A.    It functions in a similar manner as a spring, but it

22

also is different than certain kinds of springs you would

23

find in other kinds of knives.

24

Q.    Well, now I'm confused.  First you said a torsion bar

25

Macnair - X

1  is a type of spring.  Now you're saying it's different from

2  a spring?

3  A.    The springs in prohibited knives are generally what we

4  would consider a constant force spring.  That means that

5  throughout the whole stroke of opening and closing, it's

6  under constant pressure and wants to open.

7       Our knives, through a portion of a stroke, actually

8  want to close.  The spring reverses on itself, so it

9  functions very differently.

10 Q.    I understand about the function, but the fact of the

11 matter is there's a spring assisting part of that motion;

12 correct?

13 A.    There's a torsion bar.  Yes, that's correct.

14 Q.    Which you have testified is a type of spring?

15 A.    That's correct.

16 Q.    Okay.  Just a moment.

17      Counsel asked you about what your company advertises on

18 the website and how it describes the knives.  Do you recall

19 that?

20 A.    Yes, I do.

21 Q.    Okay.  Isn't it true that the information posted on the

22 Kershaw website tells buyers that it is their duty to look

23 into the laws governing the particular state they might be

24 in.  Is that correct?

25 A.    That's correct.

Macnair - X

1    Q.    Because you cannot somehow advertise to buyers that

2    these knives are legal everywhere to be possessed by

3    everyone?

4    A.    No, we cannot.

5    Q.    Okay.  That's up to judges; right?

6    A.    That's correct.

7              THE COURT:  Or legislators.

8              MS. BOLSTAD:  Right.

9    BY MS. BOLSTAD: (Continuing)

10   Q.    So by distinguishing the knives Kershaw makes from

11   switchblades, is that because switchblades are prohibited

12   items in many states?

13   A.    In many states, yes.  Not all states.

14   Q.    Exactly.  There's differences in every state; right?

15   A.    That's correct.

16   Q.    Okay.  And are you familiar with the State of Oregon

17   laws governing convicted felons possessing weapons, such as

18   knives?

19   A.    I would not consider myself an expert on that, no.

20   Q.    Okay.  If I were to tell you that the Oregon Code

21   prohibits felons from carrying blades that project or swing

22   into position by force of a spring, would you say that the

23   Kershaw 1990 is not such a knife?

24   A.    That's correct.

25   Q.    Despite your testimony that it has a torsion bar, which

Macnair - ReD

1  is a type of spring?

2  A.   That's correct.

3       MS. BOLSTAD:  Okay.  I have nothing further on

4  cross.

5       THE COURT:  All right.  Anything further?

6       MR. LEWIS:  Just one or two, Your Honor.

7

8                 REDIRECT EXAMINATION

9  BY MR. LEWIS:

10 Q.   Mr. Macnair, as far as you know, if a person is not a

11 felon, it is legal to carry one of those two knives that we

12 talked about in one's pocket so it can't be seen?

13 A.   As far as I know, yes.

14      MR. LEWIS:  Thank you, nothing further.

15      THE COURT:  Thank you, sir, for coming.

16      MR. LEWIS:  That exhibit, if I could have that, I

17 can give these to the court clerk, Your Honor.

18    Our next witness is Joe Corona.

19

20                 JOSEPH CORONA,

21 called as a witness in behalf of the Defendant, being first

22 duly sworn, is examined and testified as follows:

23

24 ///

25 ///

Corona - D

1          DIRECT EXAMINATION

2  BY MR. LEWIS:

3  Q.   Mr. Corona, what do you do for living?

4  A.   I'm a police officer for the City of Portland.

5  Q.   And you've been so employed for how long?

6  A.   Almost 13 years now.

7  Q.   You were with the force on April 10th of this year?

8  A.   Yes, sir.

9  Q.   And that was the day you arrested Mr. Johnson?

10  A.   Yes.

11  Q.   The defendant in this case?

12  A.   Yes.

13  Q.   At about what time was that?

14  A.   It was about 6:00 in the evening.

15  Q.   Daylight hours?

16  A.   Yes.

17  Q.   And what -- prior to your arresting him, you got a

18  phone call from a Deputy Burkeen about Mr. Johnson?

19  A.   Yes.

20  Q.   And, as far as you know, he was working with a

21  Deputy Zwick in his car?

22  A.   Yes, sir.

23  Q.   And you had a partner, as well?

24  A.   I did.  And they were in separate cars.

25  Q.   They were in separate cars.

Corona - D

1   A.   Yes.

2   Q.   And did you have a partner, as well?

3   A.   I did.  Officer Ables.

4   Q.   Also in a different car?

5   A.   No.  He was with me in the car.

6   Q.   And you say he called you on your cell phone or on your

7   radio?

8   A.   On the cell phone.

9   Q.   Did he have your -- he must have had your number, then?

10  A.   Yes.

11  Q.   Had you given that to him?

12  A.   We talked before.

13  Q.   And why did he -- do you know why he called you, in

14  particular, as opposed to somebody else?

15  A.   Because we were available.  We actually don't respond

16  to radio calls.  We work in a special unit at the East

17  Precinct, and so we focus on different things.

18       And we've also worked with Multnomah County SIU in the

19  past.  So we have some familiarity with the different

20  people.

21  Q.   You don't use your radio?

22  A.   We do use the radio, yes.

23  Q.   But he called on the cell phone instead?

24  A.   It's easier to get a hold of us on a cell phone

25  sometimes, and they often operate on different radio nets.

Corona - D

1   Q.    So how did he know that you were available?

2   A.    He called to see if we were available.

3   Q.    Did he know that -- whether or not you had a special

4   interest in Mr. Johnson at that time?

5   A.    No.

6   Q.    Had there been any discussion between the two of you

7   regarding Mr. Johnson's parole violation warrants?

8   A.    During the phone call, he -- I knew that Mr. Johnson

9   had a warrant for his arrest.

10  Q.    You already knew that before they called?

11  A.    Yes.  Yes.

12  Q.    And did the two of you discuss that?

13  A.    We discussed -- we didn't discuss the warrant.  We

14  discussed the fact that Deputy Burkeen had spotted

15  Mr. Johnson.

16  Q.    And about how far away were you from the scene when he

17  called?

18  A.    Oh, we were in the city.  I'm not sure exactly where we

19  were, but we were in the city of Portland.

20  Q.    And he was in the city of Gladstone?

21  A.    Yes.

22  Q.    Did the two of you talk about Deputy Burkeen and Zwick

23  following Mr. Johnson?

24  A.    No.  By the time I got the phone call, they had already

25  followed him to a location in Gladstone at a residence.

Corona - D

1    Q.    And they were aware of his warrant.  Was there a

2    reason, that you're aware of, to not have arrested him then

3    and there?

4    A.    I'm not sure exactly what the reason was.  It could

5    have been they weren't in a position to safely do that.  I

6    know they were in plain clothes.  So maybe they didn't feel

7    comfortable approaching him in plain clothes in the -- they

8    wanted a stock car.

9    Q.    Was there a reason for calling you and not, say, a

10   local police officer from Gladstone or Clackamas County

11   where they worked?

12   A.    They certainly could have done that; but, like I said,

13   we worked with them before with the Multnomah County Warrant

14   Strike Team and also with Multnomah County Special

15   Investigations Unit.

16   Q.    You were not aware at the time that Mr. Johnson had any

17   history of resisting arrest or threatening a policeman, did

18   you?

19   A.    No.

20   Q.    So at the time that you arrested him, you had no reason

21   to think that he might offer any violence or resistence to

22   you, based on his history?

23   A.    I had no specific knowledge that he threatened police,

24   but I knew he had a history of possessing weapons.  And

25   that's always a concern for me, especially when somebody is

30

Corona - D

1    wanted.

2    Q.    You prepared a search warrant in this case; correct?

3    A.    Yes, I did.

4    Q.    And in your warrant affidavit, you made references to

5    Mr. Johnson's connection to the European Kindred?

6    A.    Yes.

7    Q.    What significance did you want the Judge to give to

8    that attachment or affiliation with the European Kindred?

9    A.    Well, the fact that he's a gang member, and often gang

10   members are engaged in criminal activity.

11   Q.    And often people -- do you agree that people who are

12   not gang members are often sometimes involved in gang

13   activity?

14   A.    Absolutely.

15   Q.    Or involved in drug activity?

16            THE COURT:  What is the European Kindred?

17            THE WITNESS:  It is a --

18            THE COURT:  Speak in the mic.

19            THE WITNESS:  Oh, sorry.  It's a -- it's a

20   criminal gang.  It primarily started in the prisons.  It's

21   for -- it's basically for -- a white supremacist gang for

22   people to further their -- I mean, further business in

23   prison, to protect themselves.

24   BY MR. LEWIS:  (Continuing)

25   Q.    So it's more than just drug dealing?

Corona - D

1    A.    Right.

2    Q.    Had you read any police reports at that point in time

3    from any of Mr. Johnson's prior cases?

4    A.    At -- when I wrote the affidavit or --

5    Q.    Well, at the time that you arrested him.

6    A.    At the time I had arrested him, I -- I'm not sure if I

7    glanced at any reports, but I don't recall reading any

8    specifically.

9    Q.    So at the time you arrested him, you had not read

10   Officer Stenzel's report from 2009?

11   A.    No.

12   Q.    That's the report you referenced in your search warrant

13   affidavit?

14   A.    Right.

15   Q.    You were aware of Mr. Johnson's criminal record,

16   though, at that point; correct?

17   A.    Yes.

18   Q.    Stenzel.  Was it your purpose in including information

19   about the European Kindred in the search warrant affidavit

20   to cause the issuing judge to think that Mr. Johnson would

21   be violent towards police?

22   A.    No.

23   Q.    What about his criminal history made you think was

24   necessary to point a gun at him as you effected the arrest?

25   A.    Well, the fact that he was wanted for a parole

Corona - D

1  violation.  I believe the parole violation was for a weapon

2  offense, and that he has a criminal convictions for weapon

3  offenses, including an Attempt Assault 1.

4  Q.    Now, while en route to help with the arrest of

5  Mr. Johnson, you learned that he had parked in front of 1075

6  Clayton Way in Gladstone; is that correct?

7  A.    Yes, sir.

8  Q.    And that street runs east and west, would you agree?

9  A.    Yes.

10  Q.    And 1075, is that the -- at the west end of the

11  cul-de-sac?

12  A.    I believe it is, yes.

13  Q.    Sort of on the south side of that -- of the -- the bulb

14  that makes up the cul-de-sac?

15  A.    Right.

16  Q.    About what time did you arrive at Clayton Way?

17  A.    Well, it would have been prior to the custody.  The --

18  6:08 was the custody time, so it would have been maybe 20

19  minutes before that.

20  Q.    Did you park your car on Clayton Way?

21  A.    No.  We were parked blocks to the north in a school

22  parking lot.

23  Q.    What was the reason for parking there?

24  A.    Because the vehicle that was associated with

25  Mr. Johnson was parked at the 1075 Clayton Way, so we were

Corona - D

1    waiting out of the area, because we were in a police car,

2    albeit unmarked, and we didn't want to park on Clayton Way

3    and have him be alerted to our presence.

4    Q.    And how far away was this place where you parked to the

5    access to Clayton Way?

6    A.    It was several blocks north of.

7    Q.    And how long did it take for you to get from where you

8    were parked, approximately?

9    A.    Less than a minute.

10   Q.    The -- sorry.  I lost my train of thought, Officer.

11         So you sat there for about 20 minutes?

12   A.    Yes.  Correct.

13   Q.    And when you arrived at the parking -- the place where

14   you parked, Mr. Johnson, from what you had heard, was

15   already -- had already stopped?

16         Let me rephrase that question.  By the time you got to

17   the school parking lot, you had already heard that

18   Mr. Johnson was parked at 1075?

19   A.    Parked and inside the residence there, yes.

20   Q.    Yes.  So he was inside for at least 20 minutes?

21   A.    Yes.

22   Q.    And did you work out a plan with Deputy Burkeen as to

23   how to effect the arrest?

24   A.    Well, we were going to wait until he got up to the

25   vehicle and then effect a traffic stop on the car.

Corona - D

1    Q.    And you got a phone call, then, from Deputy Burkeen,

2    saying what?

3    A.    At that point I believe we had switched over to a

4    common tact channel, a tactical channel, so we could easily

5    communicate.  We had received information that he had exited

6    the residence and was getting into his vehicle and then was

7    driving east on Clayton Way, toward Webster Road.

8    Q.    So you're saying it's easier to communicate.  You don't

9    have to worry about dialing a phone number and waiting for

10    it to ring?

11    A.    Right.

12    Q.    So you got word that he was getting into his car?

13    A.    Right.

14    Q.    And as soon as you got that word, you started up your

15    car and made your way?

16    A.    Right.  We started moving down -- made it out to

17    Webster Road, and then south, towards Clayton Way.

18    Q.    And you made your -- you got to Clayton Way, and you

19    turned onto Clayton Way?

20    A.    When we actually got to Clayton Way, Mr. Johnson's car

21    was already at the intersection either pulling to a stop or

22    already stopped at the stop sign there.

23    Q.    Were any of the other officers there besides you,

24    Deputies Zwick, Burkeen, and Officer Ables?

25    A.    No.  Just the four of us.

Corona - D

1    Q.    So the four of you effected the stop and arrest?

2    A.    Yes.

3    Q.    With three police cars?

4    A.    With two unmarked cars and an unmarked police car, yes.

5    Q.    When you say -- so all three were unmarked?

6    A.    Yes.  So two looked like civilian vehicles and

7    Officer Ables and my car was a regular patrol car.  It does

8    not have any exterior markings.  It's what we call a slick

9    top.  So no light bar on top and no police markings on the

10   side, but it has lights and a grill, and it's a regular Ford

11   Crown Victoria.

12   Q.    Officer, I'm showing you what has been marked Defense

13   Exhibits 1 through 8.  If you can take a look at those.

14   A.    Sure.

15   Q.    Do those photos reasonably represent the area of

16   Clayton Way and Webster?

17   A.    Yes, they appear to.

18   Q.    And Exhibit 1 is pointed westbound?

19   A.    It appears to be.  Some of the photos, I think, from

20   the angles they were taken, are not going to be familiar to

21   me, because I didn't make it into the cul-de-sac.  I was

22   only -- I was confined to Clayton Way and Webster Road.

23   Q.    Okay.

24   A.    Right there in that area.  But it appears to be that.

25   Q.    So the ones that would show the cul-de-sac would be

Corona - D

1  Exhibits 3 and 4 and 5; correct?

2  A.   Yes.

3  Q.   And those that are not westbound are pointed east?

4  A.   Right.

5  Q.   That's pretty clear from the photographs?

6  A.   Yes.

7  Q.   So after you approached the vehicle, you took

8  Mr. Johnson out of the car; is that correct?

9  A.   Yes.

10  Q.   First, you had a brief conversation with him?

11  A.   Yes.

12  Q.   And it was almost a joking conversation?

13  A.   Right.

14  Q.   It was about him not being able to run?

15  A.   Right --

16  Q.   -- if he wanted to?

17  A.   Exactly.

18  Q.   And when he got out of the car, that's when you found a

19  knife on him?

20  A.   Yeah.  After he had been handcuffed, conducted an

21  inventory, and found a knife on him.

22  Q.   If I could have the witness shown -- I think it's

23  Exhibit 20 -- the knife.  I think that's the knife.

24  A.   Yes, that's the right one.

25  Q.   That's the right knife?

Corona - D

1    A.    Yes, sir.

2    Q.    You refer to it as a Ken Onion 1990 in your report?

3    A.    Yes.  It's a Kershaw 1990.

4    Q.    Were you familiar with that knife prior to that

5    evening?

6    A.    Not that particular model, but I'm familiar with the

7    type of knife.

8    Q.    Uh-huh.  You said in your affidavit that you knew it

9    was a restricted weapon.

10   A.    Yes.

11   Q.    That it's against the law for felons to possess?

12   A.    Yes, sir.

13   Q.    In your -- how did you know that it was a restricted

14   weapon?

15   A.    The manner in which it opens.

16   Q.    Had you researched the law on that?

17   A.    I have.  I've arrested people in the past for the same

18   offense.

19   Q.    Have they been prosecuted for it?

20   A.    Yes.

21   Q.    Have you arrested people who were non-felons who were

22   found to have that in they're pocket?

23   A.    If it's fully concealed, yes.

24   Q.    So, in your opinion, for you and me -- not you as a

25   police officer -- but for me to carry it in my pocket,

Corona - D

1  that's against the law?

2  A.   If it's fully concealed in your pocket, yes.  If it's

3  clipped -- the belt clip clipped on the outside of the

4  pocket and it's visible, and it's obvious there's a knife,

5  that's not a problem.

6  Q.   Clip alone announces that it's a knife?

7  A.   Correct.  It would be apparent to a reasonable person

8  that that's a knife.

9  Q.   The person who knows what knife clips might look like

10  and not a clip that holds some other kind of tool?

11  A.   In my experience, it's pretty easy to spot a knife.

12  Q.   Because you're a police officer and you're trained for

13  that?

14  A.   No.  Because I've seen lots of people carry knives.

15  Q.   Now, in preparing the search warrant, you did go to the

16  Internet to look at the Kershaw website?

17  A.   Yes, I did.

18  Q.   Did you see anywhere on the website that indicates that

19  this knife has a blade which switches into position by force

20  of a spring or centrifugal force?

21  A.   No.

22  Q.   And, in fact, the website tries to make it very clear,

23  doesn't it, that this is not the kind of knife that might be

24  considered a switchblade?

25  A.   I didn't see anything specific where it mentioned it

Corona - D

1  not being a switchblade.  It just described the -- their

2  trademarked SpeedSafe technology and described that it made

3  it easier to open the knife.

4  Q.    There's no button to push?

5  A.    There's not a button on it, no.

6  Q.    Officer, I'm handing you a plastic bag marked Defense

7  Exhibit 21.

8      If you can identify that for us, please.

9  A.    Sure.  This is a -- it's a glass pipe with a -- looks

10  like a bulbous end on it.  It's commonly used for smoking

11  methamphetamine.  It appears to be the same pipe that I took

12  out of the vehicle that Mr. Johnson was in.

13  Q.    You took it out, or Officers Ables took it out?

14  A.    Officer Ables took it out, but I logged it onto a

15  property receipt.

16  Q.    And where was Mr. Johnson at that time?

17  A.    He was in our police car, in custody.

18  Q.    Handcuffed?  Standard procedure?

19  A.    Yes.

20  Q.    The lighting conditions were pretty good at the time

21  you looked at the knife -- looked at the pipe?

22  A.    Yes, sir.

23  Q.    And you -- were you the one that processed the physical

24  evidence?

25  A.    Yes.

Corona - D

1  Q.   And that -- would it be fair to say that the pipe today

2  looks the way that it did when you seized it?

3  A.   Yes, sir.

4  Q.   Could you tell us where there are scorch marks on it?

5  A.   Appear to be on the -- take it out of the bag here.

6  There's some marks on the bottom of the bulb there, and then

7  there's also a white residue inside of the bulb there.

8  Q.   Mind if I touch it?

9  A.   Sure absolutely.  They're very faint, because that pipe

10  appears to have been only used a couple of times.

11          THE COURT:  Hand it to me, please.

12          THE WITNESS:  Yes, sir.

13  BY MR. LEWIS: (Continuing)

14  Q.   There's nothing in your report about having smelled it?

15  A.   I generally don't smell meth pipes or anything else I

16  find in cars.

17  Q.   If one were to smell a meth pipe, it has an odor,

18  doesn't it?

19  A.   It does.

20          THE COURT:  Here you go.

21          THE WITNESS:  Thank you, sir.

22  BY MR. LEWIS: (Continuing)

23  Q.   It has an unpleasant odor, doesn't it?

24  A.   Yeah, it's not pleasant.

25          THE COURT:  I've heard it described as burning

Corona - D

1    skunks.

2            MR. LEWIS:  Oh, I've heard cat urine, Your Honor;

3    but I guess the two maybe complement each other.

4    BY MR. LEWIS: (Continuing)

5    Q.    Officer, in your affidavit, you told the magistrate, to

6    whom the search warrant application was addressed, that you

7    had reviewed reports, using the plural?

8    A.    Uh-huh.

9    Q.    Is that correct?

10   A.    That's correct.

11   Q.    And, in fact, the only report that you had reviewed at

12   that point was Officer Stenzel's report; correct?

13   A.    Yes.  There were multiple reports attached to that case

14   number.

15   Q.    Let's back up a second.  You reviewed the report.  You

16   said you had not read the report prior to arresting

17   Mr. Johnson; correct?

18   A.    Correct.

19   Q.    And so when did you read Officer Stenzel's report?

20   A.    When I was in the office, after we had taken him into

21   custody.

22   Q.    So that evening?

23   A.    It was either that evening or in the following couple

24   of days.

25   Q.    Did you reread it at times over the course of the week

Corona - D

1   that you prepared the search warrant affidavit?

2   A.   Did I reread it?

3   Q.   Yeah.

4   A.   I think I read it once.

5   Q.   And you said the report is attached to it.  I'm not

6   aware of any such report attached to it.  Can you clarify

7   that?

8   A.   Well, commonly, when we write reports, there's a

9   custody report, maybe a special report, and some other

10  different types of reports.

11  Q.   From that one incident?

12  A.   Right.

13  Q.   Okay.  So we're not talking about multiple incidents?

14  A.   No, no.

15  Q.   So custody report.  As you said, a special report.  A

16  report that documents handling the evidence that evening,

17  things like that?

18  A.   Right.

19  Q.   So when you say "reports," you only meant reports --

20  A.   Referring to -- referring to that incident, yes.

21  Q.   That wasn't very clear in the affidavit, was it?

22  A.   It was clear to me when I wrote it.

23  Q.   Do you recall receiving a phone call or some

24  communication of some sort from Ms. Bolstad asking if you

25  had read other reports?

Corona - D

1    A.    We did discuss that, yes.

2    Q.    The report in question, from Officer Stenzel, is this

3    one here that I'm handing you, marked Exhibit 11?

4    A.    Okay.

5    Q.    Is that the report that we're talking about?

6    A.    Yes.

7    Q.    Before I forget, I would offer Exhibit 11.

8          MS. BOLSTAD:  No objection.

9          THE COURT:  It will be received.  I still have

10   some photographs up here that are just sitting there.

11         MR. LEWIS:  Yes, Your Honor.  Some were

12   identified.  I would offer them all if -- if the government

13   has no objection.

14         MS. BOLSTAD:  No objection.

15         MR. LEWIS:  Thank you.

16         THE COURT:  Hand them to me, will you?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Go ahead.

19   BY MR. LEWIS: (Continuing)

20   Q.    Did you have to look at that report at all while you

21   were in the process of drafting the affidavit?

22   A.    I reviewed it before I drafted the affidavit.

23   Q.    You didn't go back to reread it to make sure you had

24   things right?

25   A.    No.

Corona - D

1    Q.    I'm sorry?

2    A.    No.  No, sir.

3    Q.    Towards the top of page 2 of your affidavit --

4          THE COURT:  Hello?  Nancy?

5          Excuse me.

6          MR. LEWIS:  I beg your pardon.

7          THE COURT:  Go ahead.

8    BY MR. LEWIS: (Continuing)

9    Q.    Officer.

10   A.    Uh-huh.

11   Q.    In your affidavit, you told the magistrate that you,

12   quote, know from reading police reports that Johnson

13   commonly carries drugs, cash, and weapons in a safe or

14   lockbox in his vehicle; is that correct?

15   A.    That's correct.

16   Q.    And you said something similar, again, in your

17   affidavit, on another page, page 3?

18   A.    Okay.

19   Q.    Is that correct?  Do you have it in front of you?

20   A.    I do.

21   Q.    Okay.  I'm referring, first, at the top of page 2 and

22   then on page 3 of your affidavit.

23   A.    Okay.

24   Q.    And on page 3 you added "concealed in his vehicle."

25   Not just "in his vehicle"?

Corona - D

1   A.    Right.

2   Q.    You also said in your affidavit that the bags that you

3   had taken into possession you believed likely contained

4   weapons and drugs; is that correct?

5   A.    Yes, sir.

6   Q.    Would you agree that Officer Stenzel's report does not

7   say anything at all about Mr. Johnson commonly carrying

8   drugs and a weapon in a safe or in a vehicle?

9   A.    I don't believe there's any language in there about

10  "commonly."  I believe he does reference another incident in

11  his report.

12  Q.    He references an indent.  He doesn't say anything of

13  what happened in that incident, does he?

14  A.    No.

15  Q.    So from the report -- from that report, one can't tell

16  what went on in that other incident, can a person?

17  A.    Without referencing that report and reading it,

18  probably not.

19  Q.    In fact, in the report from Officer Stenzel, it doesn't

20  say anything at all about what Mr. Johnson commonly does,

21  does it?

22  A.    No.  The language "commonly" is not in there.

23  Q.    Had you taken any steps to investigate, to check the

24  DMV, or whatever, who the registered owner was of the

25  vehicle that Mr. Johnson was driving?

Corona - D

1    A.    Not sure at what point I did that.  I'm sure I checked

2    the registration.  That's something we commonly do on a

3    traffic stop.

4    Q.    That wasn't referenced at all in the affidavit, was it?

5    A.    Who the registered owner was?

6    Q.    Yes.

7    A.    No.  Mr. Johnson claimed he did not know who the owner

8    was.

9    Q.    I think he told you he didn't know -- didn't give you

10   the person's name.  Is that more correct to say?

11   A.    It may have been either.  He may have knew the first

12   name but didn't know any other information.

13   Q.    Well, that's different from not knowing who it is.

14   A.    Well, perhaps splitting hairs.

15   Q.    Well, you would agree that people who -- people who are

16   like Mr. Johnson, or at least what you know of him, are not

17   the most responsible people?

18   A.    Sure.

19   Q.    And they might be a little bit looser in their dealings

20   with people than maybe you or I might be?

21   A.    Absolutely.

22   Q.    And people who travel in those circles might loan each

23   other cars without knowing a whole lot about the group,

24   taking down the driver's license numbers and things like

25   that?

Corona - D

A.    Well, they generally know who that person might be and
how to get a hold of them.  Maybe have a phone number or
something like that.

Q.    Sometimes they don't want to tell people other people's
contact information, do they?

A.    Sometimes they don't.

Q.    Aside from looking into the ownership of the vehicle,
what other investigation did you do prior to -- between the
time that you arrested Mr. Johnson and the time that you got
the search warrant, relative to getting the search warrant?
Did you look further into his history prior to getting the
search warrant?

A.    I learned that in researching Officer Stenzel's report.
I checked the Multnomah County DA crime system and learned
that he had been convicted of two or three of the charges in
this case here.

Q.    Which you mentioned in your affidavit?

A.    Yeah.

Q.    You knew that he had been on parole?

A.    Yes.

Q.    You didn't take any steps to look into what parole
records might show?

A.    No.

Q.    You didn't contact his probation or his parole officer?

A.    I did not.

Corona - D

1  Q.   You thought that his criminal history was relevant to

2  the issue of probable cause?

3  A.   His previous history, yes.

4  Q.   Now, with respect to the European Kindred, you know a

5  bit about it, do you not?

6  A.   A little bit, yes.

7  Q.   You know that it's largely a prison gang?

8  A.   Right.

9  Q.   You know that it's not one of those gangs that you

10 simply send in a resignation letter if you want to quit?

11 A.   Right.

12 Q.   People can get hurt if they say, "I'm out.  I'm

13 dropping out"?

14 A.   Sure.

15 Q.   So when people do want to get out, they ease themselves

16 out.  Is that right?

17 A.   Sometimes.  Sometimes people get out suddenly.

18 Q.   So it's not unusual for a person who's trying to get

19 out to begin to distance themselves from it?

20 A.   That wouldn't be unusual.

21 Q.   And are you familiar with the tattoo process that EK

22 members go through?

23 A.   Yes.

24 Q.   It's a tattoo on one's calf?

25 A.   Right.

Corona - D

1    Q.    Did you examine Mr. Johnson for any tattoos when you

2    arrested him?

3    A.    I did not.

4    Q.    Did you look at any records that might reflect

5    examinations of his tattoos when he got busted?

6    A.    I didn't.

7    Q.    So you didn't know that his tattoos are crossed out?

8    A.    No.

9    Q.    But you had read in Officer Stenzel's report that he

10   told Officer Stenzel in 2009 that he was distancing himself

11   from the EK?

12   A.    Yes, I did read that.  But it's -- it's not terribly

13   unusual for gang members to tell police officers that

14   they're getting out of a gang or they're not associating

15   with gang members anymore.

16   Q.    But you didn't put that in?

17   A.    No.

18   Q.    You didn't want to give -- you didn't give the

19   magistrate all the information?

20   A.    I gave him the information I thought was relevant.

21   Q.    Relevant towards probable cause and towards EK

22   membership, but not that might militate against him?

23   A.    That wasn't my intention, no.

24   Q.    Well, when you chose not to put that information in,

25   what were you thinking?

Corona - D

A.   I was thinking that Mr. Johnson is a member of European

Kindred.

Q.   And you wanted the judge to know that?

A.   I thought it was relevant to what was going on.

Q.   But information that might be contrary to that, to you,

was not relevant?

A.   Well, I didn't think that the -- like I said, I think

people -- oftentimes, I've had people tell me, gang members

tell me they're distancing themselves and getting out of a

gang, and, yet, I know they're still actively participating

in that.

Q.   Of course.  You've also talked to gang members who have

actually gotten out of the gang, too, haven't you?

A.   I have.

Q.   In reality, they've gotten out?

A.   Yeah.  They generally don't associate with, you know,

the same kind of people.  They don't engage in crime.

Q.   But some people do?

A.   Some people do, absolutely.

Q.   So that will be up to the judge to decide; correct?

A.   Sure.

Q.   Okay.  After you arrested Mr. Johnson, what did you do

next?

A.   We inventoried his person, found the knife, found a

large sum of cash on him, talked with him briefly about the

Corona - D

1  cash.  He said he had had the cash to purchase a vehicle.

2  So then we notified Officer -- or, excuse me, Deputy Swail,

3  to see if he would come out to the location.

4  Q.   And why did you call Deputy Swail?

5  A.   Deputy Swail has a narcotics detection dog.  And based

6  on information that I had about what Mr. Johnson was

7  currently doing, I was interested in seeing if the dog would

8  alert on the outside of the vehicle.

9  Q.   Had you worked with Deputy Swail before?

10  A.   Yes.

11  Q.   In the context of dog sniffs and dog searches?

12  A.   Yes.

13  Q.   And who made the call?  Was it you or your partner?

14  A.   It was -- it was either me or one of the other deputies

15  that were there.

16  Q.   And he arrived pretty quickly?

17  A.   Fairly quickly, yeah.

18  Q.   Did Deputy Swail and you and other officers confer

19  prior to him taking any steps?

20  A.   Yeah.  Commonly, what happens is if a narcotics dog

21  shows up we brief them on what we have and kind of give them

22  a synopsis on what's happened, and then he decides if he

23  wants to deploy his dog or not and what that's going to look

24  like.

25  Q.   Did he do anything prior to examining the car with the

Corona - D

1  dog, after talking to you?

2  A.    I'm not sure.  I don't believe so.  I'm not real sure.

3  He may have talked to Mr. Johnson.

4  Q.    Do you recall if you talked to him about perhaps

5  talking to Mr. Johnson?

6  A.    I don't recall.

7  Q.    Now, at some point you Mirandized Mr. Johnson; is that

8  correct?

9  A.    That was when he was taken into custody.

10  Q.    Did you advise Deputy Swail of that fact?

11  A.    Yes.

12  Q.    So about how long after you got there did he get out

13  his dog and examine the car?

14  A.    After Deputy Swail arrived?

15  Q.    Yeah.

16  A.    Maybe five minutes or so.

17  Q.    You thought it was important enough to have a dog come

18  and conduct a search?

19  A.    Sure.

20  Q.    You don't do that with just anybody?

21  A.    No.  Just with people I suspect of having narcotics.

22  Q.    Uh-huh.  So where were you when Deputy Swail was

23  conducting his dog search?

24  A.    I think I was behind Mr. Johnson's vehicle, near one of

25  the unmarked cars.

Corona - D

Q.   Were you watching Deputy Swail and the dog do its
thing?

A.   Sure.

Q.   What did you observe?

A.   I observed Deputy Swail run his dog around the vehicle,
and that was pretty much it; just his typical deployment of
his dog.

Q.   About how many times did he go around the car?

A.   Yeah, I don't recall specifically, but I've seen
handlers go around once and then go around again.  Usually
no more than two times.  But usually a full trip around the
car.

Q.   And you've worked with this dog before or watched this
dog work before?

A.   Yes.  On a few occasions.

Q.   Have you seen the dog alert before?

A.   I have.

Q.   And how does it alert?  What does it look like?

A.   I believe his dog sits when it alerts.  I'm not -- not
a hundred percent.  I've worked with different dogs, and I
can't recall specifically what his alert is.

Q.   But you recall the dog not alerting?

A.   I recall Deputy Swail telling me that his dog didn't
alert.

Q.   And then what did you do?  Actually, what did he do

Corona - D

1  then?

2  A.   I don't know what he did next.

3  Q.   But he stuck around?

4  A.   Yes.

5  Q.   And what did you do?

6  A.   At that point we decided to tow the car, because it

7  presented a hazard because of where it was parked.

8  Q.   And what else?  Did you take things out of the vehicle,

9  search for --

10 A.   Yeah.  We conducted an inventory, per our policy, prior

11 to towing.

12 Q.   And you opened up the trunk?

13 A.   Yes.

14 Q.   And you took out two bags; a backpack, and a duffle

15 bag?

16 A.   Yes.

17 Q.   And you had in mind that you might be looking for a

18 safe at that point; correct?

19 A.   I didn't know what I was looking for at that point.

20 Q.   You -- okay.  When you picked up the bags, did you make

21 note of how much each one weighed, to get a sense of what

22 might be in there?

23 A.   I noted that both were fairly heavy.

24 Q.   Both were heavy?

25 A.   Yes.

Corona - D

1    Q.    You said in one bag all it had was a hood -- basically

2    a hood to a jacket?

3    A.    No, I didn't say that.

4    Q.    Prior to this time, you had already seized some money

5    from Mr. Johnson?

6    A.    Yes.

7    Q.    And that was before Deputy Swail arrived?

8    A.    Yes.

9    Q.    Did you have Deputy Swail have his dog examine the

10   money?

11   A.    No.

12   Q.    Did you have the dog sniff the bags?

13   A.    No.

14   Q.    Did you have the dogs sniff Mr. Johnson?

15   A.    No.

16   Q.    The dog was still there; correct?

17   A.    Yes.   Yeah.   In Deputy Swail's car.

18   Q.    And the dog was available for that; right?

19   A.    Would have been, yes.

20   Q.    And when you -- going back to the bags for a minute,

21   you put them down on the street, and that's when you felt

22   something heavy in one of them or something hard; correct?

23   A.    Yeah.   It actually made a clink when it hit the street.

24   Sort of a loud -- sounded like a metallic clink.

25   Q.    Now, you conducted probably countless search warrant

Corona - D

1  searches over the years; correct?

2  A.   Not countless, but a few.

3  Q.   A lot?

4  A.   Yeah.

5  Q.   About how many do you figure?

6  A.   Probably about 25.

7  Q.   That's not countless, I guess.

8  A.   Yeah.

9  Q.   Did you include information in any of those about a dog

10 alerting?

11 A.   I have, yes.

12 Q.   About how many of those did you use a dog?

13 A.   Oh, gosh, I'm not real sure on how many.

14 Q.   Approximately.  Approximation.

15 A.   Well, not all of those were -- were drug-related.  Not

16 all of those --

17 Q.   Understood.

18 A.   -- would apply for a dog.  A handful.  I mean,

19 probably --

20 Q.   Sure.

21 A.   -- maybe five.  That's a guess.

22 Q.   You would agree that it's common to include dog sniff

23 information in a search warrant when a dog alerts?

24 A.   Yes.

25 Q.   Have you been involved in a case where a dog alerted

Corona - D

1    and that information was not put in the search warrant

2    affidavit, to the best of your knowledge?

3    A.    To the best of my knowledge, no.

4    Q.    And it's true, isn't it, that dog alerts have been very

5    important in prompting the issuance of search warrants?

6    A.    Sure.

7    Q.    And whenever a dog has conducted a search and it's

8    alerted, you've included that in your report; correct?

9    A.    Yes.

10   Q.    And in your search warrant affidavit, if you end up

11   getting a search warrant affidavit --

12   A.    Yes.

13   Q.    -- would it be fair to say you've -- you've never

14   failed to include that information?

15   A.    In the affidavit?

16   Q.    Or in your reports.

17   A.    No.  I've also included in the reports that a dog

18   didn't alert; was deployed and didn't alert.

19   Q.    You have.  But you didn't even -- in your case -- in

20   this case here, you didn't even reference in your report

21   that the dog failed to alert, did you?

22   A.    No, I didn't.

23   Q.    And you didn't include that in your affidavit either?

24   A.    No, I didn't.

25   Q.    And that's an omission that you hadn't advised the

Corona - X

```
 1    prosecutor of in this case until a query was made about the
 2    dog search; is that correct?
 3    A.    That's correct.
 4              MR. LEWIS:  I have no other questions.
 5              THE COURT:  Your witness.
 6              MS. BOLSTAD:  Thank you, Your Honor.
 7
 8                         CROSS-EXAMINATION
 9    BY MS. BOLSTAD:
10    Q.    Let's pick up right where Mr. Lewis left off.
11          You testified that you have, in the past, included a
12    fact of a nonalert in your search warrant affidavit.
13    A.    Not in an affidavit, but in police reports.
14    Q.    Okay.  And do you recognize that that is information
15    that should have been in this affidavit?
16    A.    Absolutely.  That was an oversight.
17    Q.    Okay.  So explain that to us.  How does an oversight
18    like that -- what happened?
19    A.    Quite frankly, just had Deputy Swail search the -- or
20    sniff the outside of the car and then didn't have him sniff
21    the bags at all.  I know, in my experience, things that are
22    in trunks or in other compartments, sometimes the odor won't
23    make it out.  And since we didn't do a more invasive or
24    thorough search, it just -- it didn't dawn on me to include
25    it.  It was an oversight.
```

Corona - X

Q.    Did you write in this warrant affidavit and apply for
it about one week after the traffic stop?

A.    Yes.

Q.    And during that week do you remember if you were
working?

A.    I was.

Q.    Okay.  Did you have many other traffic stops between
Mr. Johnson and applying for the warrant?

A.    Yes.

Q.    Okay.  Were you trying to mislead the magistrate, who
issued this warrant, by not including the non-alert?

A.    No.  Not at all.

Q.    All right.  I'm going to back up to the beginning of
Mr. Lewis's questioning.  He asked you if it was your
purpose in including the EK, the European Kindred
information -- was it your purpose to tell the issuing judge
that this man was violent towards police, and you said no?

A.    That's correct.

Q.    What was your purpose in including the EK information
into your affidavit?

A.    To show that -- I think it's relevant and an indicator
of criminal activity and ongoing criminal activity, which I
believe was taking place on that day.

Q.    As to the knife, you testified that you have arrested
people, and those people have been prosecuted for possessing

Corona - X

1  the exact type of knife at issue here; is that correct?

2  A.    That's correct.

3  Q.    So something like the 1990 Kershaw knife?

4  A.    Yes, ma'am.

5  Q.    Do you have that knife in front of you?

6  A.    I do.  It's still here.

7  Q.    Okay.  And could you slowly turn to the Court and show

8  Judge Jones how that knife operates?

9  A.    Sure.  There's a thumb stud on the side here.  And if

10 you apply a little bit of pressure with your finger, it

11 actually swings and locks into place like that.  There's no

12 movement required by the arm.  It's just that small bit of

13 pressure on the thumb stud.

14 Q.    So does that blade swing up into position in under a

15 half second?

16 A.    Yeah, definitely under a half second.

17 Q.    And you mentioned that it requires no muscle movement

18 on your part, other than pushing the thumb stud?

19 A.    Yes.  That is it.

20 Q.    Okay.  Have you ever encountered difficulty in state

21 court prosecutions with that knife being considered unlawful

22 for a felon to possess?

23 A.    No.

24 Q.    Okay.  And so your training and experience is that

25 knife is illegal for felons to have?

Corona - X

1  A.    Yes.

2  Q.    Okay.  Let's talk about the residue on the pipe.  Do

3  you have that in front of you?

4  A.    I do.

5  Q.    You testified it was a fairly new-looking pipe and

6  maybe had only been used, I think, two or three times?

7  A.    Yes.

8  Q.    Okay.  Have you seen more well-used pipes with more

9  evidence of scorch marks and residue than this one?

10  A.    Absolutely.

11  Q.    Would it be fair to say that this pipe doesn't have a

12  lot of residue on it?

13  A.    No.  It has a very small amount of residue on it.

14  Q.    Okay.  And based on your training and experience, is

15  that, in fact, consistent with methamphetamine residue?

16  A.    Yes, it is.

17  Q.    And have you ever encountered that type of instrument

18  being used for anything but smoking methamphetamine?

19  A.    No.  Never, in my experience.

20  Q.    I'd like to address this issue of what is common.

21  Mr. Lewis asked you about the 2009 report of

22  Officer Stenzel.  Do you have that in front of you?

23  A.    I do.

24  Q.    Okay.  I'd like you to turn to it.  From reading

25  Officer Stenzel's report from 2009, did you learn, from that

Corona - X

1    incident date, that he summarized that Mr. Johnson was

2    carrying anything illegal?

3    A.    On this day or previous case?

4    Q.    On that day, when Officer Stenzel arrested him.

5    A.    On that day, there was a firearm and a Kershaw folding

6    knife with a spring assist on it.

7    Q.    And how about methamphetamine?  Did he have

8    methamphetamine on him that day?

9    A.    Yes.  There was methamphetamine, also, in the trunk of

10   the car.

11   Q.    Did he also have this large knife on him that day?

12   A.    I have not seen that knife, but I -- I know there was

13   another knife taken.

14   Q.    Okay.  So fair to say that when you read the 2009

15   report of Officer Stenzel you were familiar with the fact

16   that this man had before, had with Mr. Stenzel, a large

17   knife, a Kershaw folding knife, with spring-assisted blade,

18   as well as methamphetamine and a firearm.  That's from one

19   day in 2009; correct?

20   A.    Yes, that's correct.

21   Q.    And does that report also reference a then-recent 2009

22   case of a different police report?

23   A.    Yes.

24   Q.    And based on your read of Officer Stenzel's summary,

25   did you learn any information about what occurred in that

Corona - X

1    other 2009 case?

2    A.    Yes.

3    Q.    What did you learn?

4    A.    That he often keeps a gun and drugs in a safe in a

5    vehicle.

6    Q.    And we heard you use the word "often."  Mr. Lewis asked

7    you if the word "commonly" appeared anywhere in

8    Mr. Stenzel's -- Officer Stenzel's report, and you said no.

9    A.    Right.

10   Q.    Did Officer Stenzel, instead, use the synonym "often"?

11   A.    It appears he did, yes.

12   Q.    Okay.  And, in your understanding, do those mean very

13   similar things?

14   A.    Yes.

15   Q.    Okay.  And turning to page 5 of Officer Stenzel's 2009

16   report, did Officer Stenzel summarize statements of

17   Mr. Johnson about advising Mr. Johnson of the charges

18   against him?

19   A.    Yes.

20   Q.    And once Officer Stenzel told Mr. Johnson that he was

21   being arrested for a firearm and methamphetamine, did

22   Mr. Johnson make any statements?

23   A.    He said it evidently came from the black box.

24   Q.    And in the second paragraph on that page did

25   Mr. Johnson indicate whether he was worried about the

Corona - X

1    charges or not?

2    A.    No.    He said he wasn't worried because the DA's office

3    would drop them.

4    Q.    And why did he think that?

5              MR. LEWIS:    Objection.

6              THE COURT:    Sustained.

7              MS. BOLSTAD:    Let me rephrase.

8    BY MS. BOLSTAD:    (Continuing)

9    Q.    Based on the statements made to Officer Stenzel, did

10   Mr. Johnson indicate why he was not worried about that?

11   A.    According to the report, he told Officer Stenzel that

12   the DA dropped them last time, referring to the previous

13   case.

14   Q.    And based on that, is it a fair inference, from your

15   perspective, that in that last case he had similar items,

16   like methamphetamine and a gun?

17   A.    Yes.

18   Q.    Those are two incidents in 2009 involving

19   methamphetamine and a gun?

20   A.    Yes, ma'am.

21   Q.    And here you are, investigating Mr. Johnson again, and

22   he has a knife; is that correct?

23   A.    Right.

24   Q.    And he also has a stun gun?

25   A.    Yes.

Corona - X

Q.   And he has $7,100 cash on him?

A.   Yes.

Q.   Those are three instances that you're at least familiar with?

A.   Yes.

Q.   And you're familiar with those three instances at the time you wrote the search warrant?

A.   Yes.

Q.   Mr. Lewis asked you if you knew exactly what you were looking for when you arrested Mr. Johnson.  I'd like the record -- I'd like you to clarify for the record:  When did you read Mr. Stenzel's report?  Was it after this traffic top and search?

A.   Yes.

Q.   Okay.  And so were you aware -- at the time you picked that bag out of the trunk and put it on the ground, were you aware of this prior historical information about Mr. Johnson?

A.   No.

Q.   Okay.  Were you trying to hear a metallic clink because you were somehow aware that he had a safe?

A.   No.  I was taking the items out of the trunk to find out what else was in the trunk.

Q.   Okay.  I'd like to ask you about the location of the traffic stop.  Were there other areas that Mr. Johnson could

Corona - X

1   have stopped his vehicle that would have been a safe place

2   to leave it?

3   A.   There were areas closer to the curb and out of -- like,

4   not as close to the intersection, yes.

5   Q.   And did your maneuvers, as police, somehow prevent him

6   from pulling to one of those safer locations?

7   A.   He certainly had the ability to pull over, because we

8   didn't make contact with his vehicle.

9   Q.   Okay.  As to the seizing the bags from the vehicle and

10  lodging them into evidence or the property room, what was

11  your purpose in that?

12  A.   My purpose was to apply for a search warrant.  I

13  believe that likely there was evidence of a crime inside the

14  two bags.

15  Q.   And so you seized them to give yourself the time to

16  apply for that warrant?

17  A.   Yes, ma'am.

18  Q.   Okay.  And then, finally, on EK membership, you

19  testified that you're familiar with gang members saying all

20  sorts of things to police about how they are not, in fact,

21  involved in gangs; correct?

22  A.   Right.

23  Q.   Have you reviewed this parole record that Mr. Lewis is

24  referring to?

25  A.   Yes.

Corona - X

1   Q.   I'd like to show you a page of that record, and I'd

2   like to admit it.   Just a moment.

3        I'm going to show you Defendant's Exhibit 13.

4   A.   Okay.

5   Q.   And this is the same copy you and I reviewed earlier?

6   A.   Yes.   Yes.

7   Q.   On the second page of that exhibit --

8   A.   Uh-huh.

9   Q.   -- could you please tell the Court what is in the first

10  highlighted box?

11  A.   Sure.

12  Q.   And, sorry, let me ask you this:   Do you know who made

13  that record?

14  A.   I don't specifically.   There's a name here under

15  "author."

16  Q.   Okay.

17  A.   I'm not sure exactly who it is.

18  Q.   Is it your understanding that this record came from the

19  Oregon Department of Corrections?

20  A.   Yes.

21  Q.   Okay.   So whoever is making the record entry, would

22  that be someone in that facility or perhaps in the parole

23  board?

24  A.   I would assume that, yes.

25  Q.   Okay.   Tell us what is stated in the first entry.

Corona - X

1   A.   It says -- this is dated May 2nd of 2012.  Johnson has

2   an EK shield and has been previously known to be actively

3   affiliated with this prison gang.  PO's most recent crime.

4   However, notes O is EK affiliate but has been blacklisted by

5   EK.  They do not consider him in good standing.  Thus, may

6   not be appropriate to R-E-T -- I assume return -- to gang

7   caseloads, since he has dropped out.  PO has had 1.5 years

8   and several violations but none gang-related, as he was

9   outcast from the former sect.

10  Q.   How about the second entry there of the highlighted

11  variety?

12  A.   Sure.

13  Q.   What does that entry state?

14  A.   That first entry, I'm sorry, was highlighted

15  "companions."  The second one is highlighted "antisocial

16  pattern."  Same author.  Also on the same date.  May 2nd.

17  Johnson received a score of 51 ANT on his PAI exam.  He

18  reports early exposure and use of drugs, which has

19  continued.  He admits to prior affiliation with EK while

20  incarcerated, however currently reports being a dropout and

21  has covered his shield.  Johnson has demonstrated the

22  pattern of criminality incarceration.

23  Q.   And so this line that Mr. Johnson has dropped out of EK

24  and covered his shield, is it your reading of that, that

25  that is purely from Mr. Johnson's self report?

69

Corona - X

1   A.   That's how I read it.

2           MR. LEWIS:  Objection, Your Honor.  Speculation.

3   Calls for an improper conclusion.

4           THE COURT:  He can answer it.

5           THE WITNESS:  Based on the way I read the two

6   paragraphs, it looks like this information has come in

7   directly from Johnson.

8   BY MS. BOLSTAD: (Continuing)

9   Q.   Is there any indication that his calf was examined by

10  the reporting party?

11  A.   No.

12  Q.   Is there any indication that the reporting party was

13  actually sitting in the same room with Mr. Johnson when

14  writing this report?

15  A.   No.

16  Q.   Okay.  And had you ever seen this parole record prior

17  to this criminal case in 2014, after you had arrested him?

18  A.   No.  The first time I saw this was earlier this

19  morning.

20  Q.   Okay.  Is it common for you to receive and review

21  parole documentation?

22  A.   No.

23  Q.   Okay.  Have you ever seen such a thing before?

24  A.   I have not.

25          MS. BOLSTAD:  Okay.  I have nothing further.

Corona - ReD

1    Thank you.

2              THE COURT:  Anything further?

3              MR. LEWIS:  Just a few, Your Honor, if I could.

4

5                    REDIRECT EXAMINATION

6    BY MR. LEWIS:

7    Q.    When you and the other officers stopped Mr. Johnson,

8    you had your lights flashing?

9    A.    Yes.

10   Q.    Sirens?

11   A.    No.

12   Q.    But lights?

13   A.    Yes.

14   Q.    Did all the police cars have their lights on?

15   A.    Our patrol car had lights on, and I believe the other

16   vehicles had, like, visor lights, or something, that flips

17   down.  It's a very small light.  I think Deputy Burkeen's

18   lights were on.  I'm not sure about Deputy Zwick's.

19   Q.    And by "lights," we're talking about the red and blue

20   flashing lights?

21   A.    Yes, sir.

22   Q.    So every car had something indicating that you're the

23   police?

24   A.    Some indicator like that, yes.

25   Q.    This wasn't just a normal traffic stop driving down the

Corona - ReD

1  road because your taillight's out?

2  A.    Right.

3  Q.    And the purpose in conducting this kind of stop is to

4  put a person off balance and to startle them so that they

5  can't react in a way that might endanger themselves or you

6  or somebody else?

7  A.    Right.  The basic premise behind that is to prevent a

8  pursuit.

9  Q.    And to get them to stop right now where they are,

10 period?

11 A.    Yeah.  But main thing it is is to prevent them from

12 fleeing.

13 Q.    Yes.

14 A.    There's different kinds of box-ins, which is what this

15 maneuver is called.  We performed a loose box-in, so there

16 was distance between the cars.

17 Q.    About how much distance are you talking about?

18 A.    Maybe a couple of feet.

19 Q.    With respect to the -- I'd like to ask you about the

20 pipe for a second.  You do drug cases, correct, as part of

21 your work?

22 A.    As part of my work, yes.

23 Q.    You do carry a field test kit with you in your car?

24 A.    I generally don't.

25 Q.    Do you have a way of field testing things, though, do

Corona - ReD

1    you not?

2    A.    I generally do that back at the office.

3    Q.    And you know how to do that yourself?

4    A.    Yes.  I've been trained and certified to conduct those

5    tests.

6    Q.    And that will give you at least a presumptive result as

7    to whether something is a controlled substance of one sort

8    or another?

9    A.    Yes, sir.

10   Q.    You didn't do that in this case, did you?

11   A.    No.  My practice, I don't NIK test paraphernalia like

12   that.  Generally, there's not enough.  A NIK test is a field

13   test.  There's not enough of the drug -- enough quantity to

14   actually NIK test it usually.

15   Q.    You could have had it tested; correct?

16   A.    Yes.  Generally, those are tested at the lab.

17   Q.    You could have had it tested?

18   A.    If I wanted to send it to the lab, yes, it could have

19   been tested.

20            MR. LEWIS:  No other questions.  Thank you.

21            THE COURT:  Thank you, sir.  You may step down.

22            THE WITNESS:  Thank you.  Would you like me to

23   leave the --

24            THE COURT:  We'll take our lunch break.

25        How much time do you think you need?  Half hour?

```
 1              MS. BOLSTAD:  I can do whenever the Court wants me

 2    back.  Half hour is plenty.

 3              MR. LEWIS:  Oh, half hour for lunch or half hour

 4    for the next witness -- or the rest of the witnesses?

 5              THE COURT:  Well, you have to have time to get a

 6    bite.

 7              MR. LEWIS:  Yes.

 8              THE COURT:  So let's -- let's pick up at 1:00.

 9              MS. BOLSTAD:  Thank you, Your Honor.

10              MR. LEWIS:  That will work.  Thank you very much,

11    Your Honor.

12        So the Court knows, I think I might just have one

13    witness left.

14              THE COURT:  What?

15              MR. LEWIS:  So the Court knows, I think I have

16    just one witness left.

17              THE COURT:  Oh, really?

18              MR. LEWIS:  I think so, yes.

19              THE COURT:  Are you going to put on any witnesses?

20              MS. BOLSTAD:  It depends on what happens next.  I

21    have all of the defense witnesses here, ready to go, so if

22    he doesn't wish them to stick around, I think we should talk

23    about --

24              THE COURT:  Who's your next witness?

25              MR. LEWIS:  My next witness was going to be
```

1  Officer Stenzel.  That will take -- that will take long

2  enough to where I think we should not do it right now.  I

3  think we should wait until after lunch.

4          THE COURT:  Let's pick up at 1:00.

5          MR. LEWIS:  Thank you very much, Your Honor.

6                  (Lunch break taken.)

7          DEPUTY COURTROOM CLERK:  All rise.

8          THE COURT:  We have an arraignment that you wanted

9  to do?

10          MS. BOLSTAD:  Yes, Your Honor.

11          MR. LEWIS:  Oh, on the superseding indictment?

12          THE COURT:  Yeah, superseding indictment.

13          MR. LEWIS:  I wasn't aware, but that's fine.  We

14  can go forward.

15          THE COURT:  Do you want just to take a look at it

16  quickly?

17          MR. LEWIS:  I have a copy.  I've seen it.

18          THE COURT:  What?

19          MR. LEWIS:  Mr. Johnson has a copy of that.  We've

20  discussed that.

21          THE COURT:  Okay.  In respect -- is this thing on,

22  Nancy?  Nancy?

23          THE LAW CLERK:  Yes, it's on.

24          THE COURT:  Okay.  The -- tell me the background

25  of the superseding indictment.

1          MS. BOLSTAD:  Yes, Your Honor.  Thank you.  When

2     the defendant was initially --

3          THE COURT:  Just a moment.

4        This is not on.

5          THE LAW CLERK:  It's the assisted listening.

6     Sorry, sir.

7          THE COURT:  Would you always please check these

8     things in advance?

9          THE LAW CLERK:  Yes.

10          THE COURT:  Okay.  Thank you.

11          MS. BOLSTAD:  Thank you, Your Honor.  The initial

12     indictment in this case used the incorrect date of the

13     offense, so the government went back to grand jury to insert

14     the correct date, April 10, 2014, that is the only change to

15     the indictment in this superseding form.

16          THE COURT:  All right.  Do you have any objection

17     to the correction?

18          MR. LEWIS:  No, Your Honor.

19          THE COURT:  Do you, sir?

20          THE DEFENDANT:  I do not, Your Honor.

21          THE COURT:  Thank you.

22        Arraignment will be -- will be unnecessary to do it

23     formally.  There's no objection to it.

24          MS. BOLSTAD:  Thank you, Your Honor.

25          THE COURT:  Thank you.  Do you want this back?

Swail - D

1      Okay.  Are you ready for your next witness?

2           MR. LEWIS:  We are, Your Honor, yes.  Before we

3  start, I think, as a housekeeping matter, we had failed to

4  offer Exhibits 13, which was the parole record, and 21,

5  which is the pipe.

6           MS. BOLSTAD:  No objection.

7           THE COURT:  It will be received.  Thank you.

8           MR. LEWIS:  I would call Deputy Adam Swail.

9

10                    ADAM SWAIL,

11 called as a witness in behalf of the Defendant, being first

12 duly sworn, is examined and testified as follows:

13           DEPUTY COURTROOM CLERK:  Please sit down and state

14 your name and spell your last for the record.

15           THE WITNESS:  My name is Adam Swail, S-W-A-I-L.

16

17                 DIRECT EXAMINATION

18 BY MR. LEWIS:

19 Q.   Mr. Swail, what do you do for a living?

20 A.   I'm a deputy with the Multnomah County Sheriff's

21 Office.

22 Q.   How long?

23 A.   I'm in my 22nd year.

24 Q.   22nd year?

25 A.   Yeah.

Swail - D

1   Q.   And so you were so employed on April 10 of this year?

2   A.   I was.

3   Q.   And are you part of the dog detail?

4   A.   Well, I'm actually part of the Special Investigations

5   Unit, but one of my functions is I handle a narcotics K-9.

6   Q.   You used the dogs or the -- the narcotics K-9 to help

7   look for drugs?

8   A.   That's her function, yeah.

9   Q.   And were you called upon to use a dog in this case on

10  April 10th?

11  A.   I was.

12  Q.   Who called you to the scene?

13  A.   Deputy John Zwick from the Warrant Strike Team.

14  Q.   And what information did he give you over the

15  telephone?

16  A.   Not a lot.  Just basically that they had taken a

17  suspect into custody and wanted my assistance with my K-9.

18  Q.   Were you told what he was under arrest for?

19  A.   I think I knew that he had a probation or parole

20  violation warrant or something like that.

21  Q.   And about when did you arrive on the scene,

22  approximately?

23  A.   Let's see.  I'll look at my report real quick.

24  Exactly -- he was already in custody when I arrived.  He was

25  in the back of a patrol car.

Swail - D

1  Q.    When you got there, did you first confer with other

2  officers?

3  A.    Yes.

4  Q.    And they had told you what they had seized or what had

5  happened so far?

6  A.    They just had told me they had taken him into custody

7  and that's pretty much where they were.  Nothing had been

8  searched or done.  I believe there was money found on his

9  person during the search.

10  Q.    They told you about that?

11  A.    Yes.

12  Q.    And they explained to you that they suspected him of

13  possessing drugs?

14  A.    Yes.

15  Q.    That's why you were there?

16  A.    Right.

17  Q.    Okay.  And they didn't mention a pipe at that point,

18  did they?

19  A.    They did not or had not.

20  Q.    They had not yet conducted an inventory search?

21  A.    Correct.

22  Q.    Were you aware that you might be needed until you had

23  gotten that phone call?  In other words, you were not aware

24  that they might be arresting Mr. Johnson that night prior to

25  getting the call?

Swail - D

1   A.    I don't recall, but I know that he was a part of a

2   larger investigation, and persons in that investigation were

3   being arrested on warrants and things.  So it wasn't

4   surprising to me when -- when we received -- when I received

5   a call to go to assist.

6   Q.    And you were available and came right away?

7   A.    I was.

8   Q.    Was it still daylight when you arrived?

9   A.    It was.

10  Q.    And after you concurred with the other officers, what

11  did you do next?

12  A.    I contacted Mr. Johnson in the back of the patrol car,

13  advised him of his *Miranda* rights, and he told me he

14  understood his rights by saying "Yes."  And then I asked him

15  about the money that had been found on him when he was

16  arrested.

17      He did not respond to that question, so I went and

18  asked him for consent to search the vehicle.  He denied

19  consent and asked for his attorney, and I didn't speak with

20  him further.

21  Q.    And by being silent, you took that as him exercising

22  the right to be silent?

23  A.    When he didn't answer the question?

24  Q.    Yes.

25  A.    No, I didn't take that at all.

Swail - D

1  Q.    But he was told that he had the right to remain silent?

2  A.    Correct.

3  Q.    And that's what he did?

4  A.    Right.

5  Q.    Okay.

6  A.    But he -- yeah, he could have been thinking of an

7  answer or not sure how to answer.  There's a lot of reasons

8  why he would not have responded.

9  Q.    Did you relay that implication to the other officers?

10  A.    I did.

11  Q.    And after you were denied consent, what did you do

12  next?

13  A.    Then I was asked to deploy my K-9, and I used my K-9 to

14  search the exterior of the vehicle.

15  Q.    Can you describe for us what that involved?

16  A.    The normal route that we used or that I used to search

17  for my dog is to start at the driver's side front headlight

18  and go around counterclockwise.

19  Q.    Is there a reason for doing it that way?

20  A.    That's just how we trained.  I work better working from

21  left to right.  I'm left-handed.  I like the leash on my

22  left hand.  That's just how I've always trained, and that's

23  how I always do it.

24  Q.    You're looking to see if the dog is going to alert to

25  the presence of drugs?

Swail - D

1 A. Broadly, yeah.

2 Q. When you say "broadly," what do you mean?

3 A. Well, an alert is just the final response the dog does.

4 It's more called an alert package.  So I'm looking for not

5 just a final response, but for a series of behavior changes

6 that would indicate that the dog is in odor or that it's

7 been trained to find.

8 Q. When it walks around, is it actually sniffing the car,

9 or is it walking around the car?

10 A. No, we're sniffing there.

11 Q. And the dog is trained to actually be -- trained to be

12 sniffing, as opposed to just walking around looking for

13 squirrels or whatever might be around?  It's working?

14 A. Correct.

15 Q. And what does this dog do when she alerts?

16 A. Her final response is to sit.

17 Q. And what does she do before that?

18 A. Well, there's lots of indicators in the alert package

19 that we call things like a wagging of the tail, focused

20 breathing, where the dog may go from open-mouth breathing to

21 closed-mouth breathing.  You might get a large suck in of

22 air and then a purge.  You may get a bracketing, where the

23 dog will go to start to work one way and then realize the

24 odor is getting fainter and then turn around and go -- move

25 back the other way to try and pick up the edges of the odor

82

Swail - D

1    and so it can work back towards the center.

2    Q.   So there's lots of things that we look for that would

3    tell us that the dog's in odor and working its way to a

4    final response.  So there's a spectrum of responses, then?

5    Is that fair to say?

6    A.   No.  That's -- like I said, really the best description

7    is this alert package.  There's several indicators or

8    several behaviors that the dog exhibits leading up to the

9    final response.

10   Q.   So if you're getting one scent in the package, you will

11   then get the final sitdown?

12   A.   Maybe.  Maybe not.  The dogs are trained to assert --

13   to alert when they're as close to the source of the odor as

14   they can.  So there's times when you may have a dog that's

15   in odor and recognizes they're sort of there but won't give

16   you a final response because it's not sure or not as close

17   as it can get.

18   Q.   And you wrote a report in this case?

19   A.   I did.

20   Q.   And said the dog did not alert?

21   A.   Correct.

22   Q.   You said nothing else about other parts of the package;

23   is that correct?

24   A.   Correct.

25   Q.   Would that be fair to say, then, that there were no

Swail - D

1   other parts of the package present?

2   A.   Correct.  I would have written it, had there been.

3   Q.   And how many times did you and your dog walk around the

4   car?

5   A.   I don't remember specifically in this case, but I

6   usually do two loops around the car.  A low and a middle.

7   Q.   And out of respect for her, her name is Ellie; correct?

8   A.   Ellie, correct.

9   Q.   You and Ellie walked around the car a couple times?

10  A.   Correct.  We search -- it was not just a walk, but we

11  worked around the car.

12  Q.   How long does it take to walk around a car, generally?

13  A.   One time, 15 seconds.

14  Q.   So it's a fairly slow stroll?

15  A.   No.  I think that's pretty quick.

16  Q.   Okay.  But you do it meant to be thorough?

17  A.   You go the -- dog -- every dog has its pace, and that's

18  my dog's pace.  And the pace that they set is the pace that

19  they're -- where they're thorough.  Some dogs are much

20  slower.  My first dog was much slower than my second dog.

21  So each dog has its own pace.

22  Q.   Whether you're with Ellie or some other dog, you take

23  steps to make sure you don't give any clues to the dog, so

24  it doesn't alert falsely; correct?

25  A.   Correct.

Swail - D

1    Q.    Okay.

2    A.    What you're referring to is cueing the dog, and we take

3    great pains during training to eliminate cues.

4    Q.    When you walked around the exterior of the car.  Were

5    your car doors open or closed?

6    A.    They were closed.

7    Q.    And is that part of standard protocol?

8    A.    Yeah.  Well, I searched the car as it's found.  I don't

9    mean to manipulate the car at all.

10   Q.    But you have -- you have -- so when you search the

11   cars, you find the car with the doors open.  You keep them

12   open.  You don't close it to conduct the dog examination?

13   A.    I suppose if that's the circumstances, that's what I

14   would do, yeah; but that's not what happened here.

15   Q.    I understand.

16   A.    The doors were closed.

17   Q.    And the trunk was closed?

18   A.    It was.

19   Q.    And after Ellie failed to alert, did you then discuss

20   that with the other officers?

21   A.    Yeah.  I put her away, and then I told them we didn't

22   get an alert.

23   Q.    What was their reaction?

24   A.    Matter of fact.  Okay.

25   Q.    Was there any discussion, then, as to what to do next?

Swail - D

A.    Yeah.  I mean, they -- they didn't discuss with me what their plan was, but they told me that they would conduct an inventory search.

Q.    And you stuck around?

A.    I did.

Q.    Was there a reason for you not leaving?

A.    Yeah.  Because they needed my assistance.  There were more people there, more helpful.  And there was the money that had been found was going to be taken as evidence, and I assisted with that.

Q.    The dog didn't -- dog wasn't used to smell the money, was it?

A.    It was not.

Q.    Was there any discussion about having Ellie smell the money?

A.    There was not.

Q.    Have you ever used Ellie to smell money?

A.    I have.

Q.    Did you suggest that perhaps Ellie could be used to smell the money in this case?

A.    I did not.

Q.    Was there a reason for that?

A.    In currency sniffs, I -- I greatly prefer that the currency be found naturally by the dog in the normal course of working.  And the money had already been taken into

Swail - D

1   custody, and so to conduct a currency sniff in the field is

2   usually not the most effective way, not the most accurate

3   way, to do it.  It would have had to have been done later in

4   a more sterile environment.

5   Q.   So it could be done later?

6   A.   It could be done later.

7   Q.   It was not in this case?

8   A.   It was not.

9   Q.   And no effort was made to use Ellie to sniff

10  Mr. Johnson?

11  A.   Absolutely not.  That's against case law.  We're not

12  allowed to do that.

13  Q.   Okay.  You were present when the other officers took a

14  couple of bags out of the trunk; is that correct?

15  A.   I was.

16  Q.   And the dog, Ellie, was not used to sniff those?

17  A.   She was not.  She was in the car.

18  Q.   She could have been taken out to walk around to see if

19  she got a hit on those, could she not?

20  A.   Theoretically?

21  Q.   Yeah.

22  A.   Well, theoretically, sure.  But that's not something I

23  would do.

24  Q.   Well, why not?

25  A.   Because they're already conducting an inventory search.

Swail - D

1   A search with a K-9 during an inventory search is not

2   usually appropriate.

3   Q.   Would she not be able to alert to the bags if there's

4   drugs in them?

5   A.   Potentially.  But they already had a lead -- a lawful

6   reason for searching the car, so they don't need my dog to

7   do that.

8   Q.   In your report, you said that they had seized the bags

9   so that they could work on getting a warrant for later;

10  correct?

11  A.   Correct.

12  Q.   So if the dog had -- if Ellie had smelled the bags --

13  I'm not using the right words -- but if the K-9 examination

14  of the bags, done in an appropriate fashion, had resulted in

15  an alert, that would have been relevant, would it not?

16  A.   It would have been.

17  Q.   And the dog had already not alerted, correct, on the

18  car?

19  A.   On the car?

20  Q.   Yes.  Was there any discussion with the officers about

21  maybe using Ellie for the bags?

22  A.   There was not.

23  Q.   And you didn't bring it up?

24  A.   I did not.

25  Q.   And when you did leave, you left with the money that

Swail - D/X

1    had been seized to take it back to headquarters?

2    A.    I did not take it.  Deputy Burkeen took it.

3    Q.    I'm sorry.  Burkeen took it.

4    A.    I filled out a property receipt.

5    Q.    Is there a reason why the money went to Multnomah

6    County and not Portland Police or someplace else?

7    A.    Yeah, the reason why we took it was that if there was a

8    civil forfeiture proceeding that was going to take place, it

9    was easier -- and if we were to conduct that civil

10   forfeiture, it's easier if it's in our custody rather than

11   the City of Portland.

12            MR. LEWIS:  I have no other questions.

13            MS. BOLSTAD:  Thank you, Your Honor.  Just a few

14   questions.

15

16                    CROSS-EXAMINATION

17   BY MS. BOLSTAD:

18   Q.    Deputy Swail, you mentioned that you don't run your dog

19   during the inventory search of items taken out of the

20   vehicle?

21   A.    Correct.

22   Q.    Okay.  Is there a difference if those items -- sorry.

23   Is there a difference, in your mind, when those items are

24   taken out of the vehicle pursuant to a different exception

25   to the search warrant requirement?

Swail - X

1   A.   Yes.   Say if you had a vehicle exception, then that

2   would be appropriate for the dog, because you have probable

3   cause to search the contents of the vehicle, not just

4   limited to by the inventory search?

5   Q.   Okay.   Is that because you, based on your training,

6   know that you are not to use an inventory for -- as a way to

7   get to items that -- and use your dog on items that were not

8   seized pursuant to the automobile exception?

9   A.   That's correct.

10   Q.   Okay.   Talk to us about the commonalities of, you know,

11   does a non-alert of a closed vehicle -- how often does that

12   happen?

13   A.   It's very rare, in my experience.   In this particular

14   dog, who I have been working with -- this dog has been

15   worked six years, I think she has gotten three exterior

16   alerts, and those -- in each instance the car was damaged --

17   there was some form of damage that allowed the odor to

18   escape from the vehicle.

19   Q.   Okay.   So talk to us about that.   Is it -- when there

20   is a dent or an opening in a vehicle, is that a more common

21   way for the odor to escape?

22   A.   It is.   So, really, a dog that -- the odor has to be

23   available to the dog for it to smell it and get an alert.

24   And there are many, many things that can affect the

25   availability of that odor to a dog, things like the quantity

Swail - X

1   of the drugs, the -- how it's packaged, and the temperature

2   inside the car versus outside the car.  Wind.  The -- how

3   the car is sealed.

4       So all those things can affect whether the odor escapes

5   and becomes available to the dog.  So in an instance where I

6   have gotten exterior alerts, that the drugs had been close

7   to the damaged portion of the vehicle or in an area that

8   wasn't sealed.

9   Q.   All right.  And so in three years, it sounds like, in

10  exterior, dog --

11  A.   Six years.  Three alerts.

12  Q.   Six years.  Only three alerts when your dog has run on

13  the exterior of the vehicle?

14  A.   Correct.

15  Q.   Okay.  Does she alert more often when the contents of

16  the vehicle are opened up and shown to her in a mobile

17  vehicle exception circumstance?

18  A.   Yeah.  That's much more advantageous for our searches

19  when -- less things in the way makes the odor more

20  available.

21  Q.   Okay.  You mentioned quantity.  In this case there were

22  probably four ounces seized out of the trunk; is that

23  correct?

24  A.   Correct.

25  Q.   Would it be more likely for an odor to escape the

Swail - X

1   vehicle with a higher quantity of methamphetamine?

2   A.   Yes.   Absolutely.

3   Q.   Okay.   So, for example, 22 pounds of methamphetamine

4   inside the vehicle produces a more pungent odor?

5   A.   It is a greater quantity to produce the odor, and it

6   also does other things, like it creates bigger vapor

7   pressure, which pushes the odor out more, versus a small

8   quantity produces much less vapor pressure and can get --

9   can't get through the packaging, as well.   So the bigger the

10  odor, it overcomes all those impediments to the odor

11  escaping.

12  Q.   All right.   And then you mentioned wrappings and things

13  in the way of your dog.

14  A.   Correct.

15  Q.   So is it less likely for that odor to reach outside the

16  vehicle when it is within multiple layers of packaging?

17  A.   Yes.   I mean, packaging is a big influence.   Strangely,

18  clothing seems to seal odor in very well.   Clothing inside

19  luggage seems to be a big deterrent to dogs, for whatever

20  reason.   Luggage also tends to have kind of like a

21  waterproof barrier in there, which is almost like another

22  piece of packaging.   It seals odor in.   And you combine that

23  with the seals on cars prevent water from getting into a

24  car, like in Oregon, and you get a pretty tight seal.

25  Q.   Okay.   And so, in your estimation, what is this

Swail - X

1  non-alert, when, in fact, drugs were inside the vehicle?

2  What is the meaning of that to you?

3  A.    It's simply that no odor was available to the dog.

4  Q.    Okay.  It does not mean to you that there were no drugs

5  in the car?

6  A.    Not at all.

7  Q.    Okay.  Oh, in those six years, how many exterior sweeps

8  have you done of a vehicle?  Estimate.

9  A.    400.

10  Q.    Okay.  So three out of 400?

11  A.    Maybe 300.

12  Q.    Three out of 300.

13  A.    And in my entire 16 years handling dogs, I probably got

14  a half a dozen, maybe ten, exterior alerts, and there's

15  probably been more than 1,500 car exterior searches.

16  Q.    Okay.  And in those times when the exterior alert

17  happened, were there drugs inside the vehicle?

18  A.    Every single time.

19  Q.    And how about in the cases where there was no alert?

20  Have you found drugs in a vehicle?

21  A.    Many times.  Many times.

22          MS. BOLSTAD:  Okay.  I have nothing further.

23          THE COURT:  Anything further?

24          MR. LEWIS:  I just have one question, if I could.

25

Swail - ReD

1                    REDIRECT EXAMINATION

2  BY MR. LEWIS:

3  Q.   Officer, if dogs virtually almost never alert to a

4  closed vehicle, why even take the -- take the steps to

5  conduct such an examination?

6  A.   Because of the -- well, there's several reasons.  You

7  might get that alert.  This might be a circumstance where

8  the odor is available.  You never know prior to a search

9  whether the odor is going to be available to the dog or not.

10  There are also times when things are hidden on the exterior

11  of the vehicle or in the engine compartment, the wheel well.

12  We've had several cases where a large amount of drugs has

13  been hidden in a compartment that's really more on the

14  outside of the vehicle and not sealed well, but just

15  concealed, and we get those alerts.

16  Q.   So those are things we want to look for, as well.  Not

17  just the contents of the interior of the vehicle.  So those

18  few hits that you referred to, you refer to drugs that might

19  have been on the inside of the car, as opposed to the wheel

20  well or someplace hidden outside the body of the car?

21  A.   That's correct.

22            MR. LEWIS:  No further questions.

23            THE COURT:  The last doggy search we had was out

24  at the airport, and he always stopped for a cup of coffee,

25  and then he went to his search.

Swail - ReD

1      MR. LEWIS:  Which is funny the dogs would know

2  that, too.  They know it's coffee time.

3      THE COURT:  Thank you, Your Honor.

4      MR. LEWIS:  If you can call in Officer Corona.

5  I'm sorry.  Stenzel.

6    Judge, was it decaf or regular coffee?

7      THE COURT:  It was regular.  Absolute routine.

8  Wouldn't do anything until he got his coffee.

9    I know other people like that.

10     MR. LEWIS:  So the Court knows, this will be my

11 last witness.

12     THE COURT:  Fine.  Thank you.

13     DEPUTY COURTROOM CLERK:  Please raise your right

14 hand.

15                    CORY STENZEL,

16 called as a witness in behalf of the Defendant, being first

17 duly sworn, is examined and testified as follows:

18

19     DEPUTY COURTROOM CLERK:  Go ahead and have a seat

20 and state your name and spell your last for the record.

21     THE WITNESS:  My name is Cory Stenzel.  And you

22 spell that S-T-E-N-Z-E-L.

23

24 ///

25 ///

95

Stenzel - D

1                    DIRECT EXAMINATION

2  BY MR. LEWIS:

3  Q.   And, sir, what do you do for a living?

4  A.   I'm a detective with the Portland Police Bureau.

5  Q.   And you've been a detective for how long?

6  A.   Since 2012.

7  Q.   And you were so employed -- I guess you were employed

8  by the Portland Police Bureau in 2009?

9  A.   Yes, I was.

10 Q.   And then you were -- I have "a mere officer."

11 A.   A patrol officer.

12 Q.   Patrol officer.

13      And you were with the department as an officer on

14 November 27, 2009?

15 A.   I was.

16 Q.   And on that date did you have an encounter with

17 Mr. Johnson that resulted in his arrest?

18 A.   I did.

19 Q.   And, Detective, the basis to your encounter was a

20 traffic stop due to your knowing that he was driving while

21 suspended?

22 A.   Yes.  Driving while suspended.  And then there was also

23 a traffic violation of failure to maintain a lane.

24 Q.   A couple traffic infractions?

25 A.   Correct.

Stenzel - D

1    Q.    Those are not arrestable offenses?

2    A.    They are not.

3    Q.    And was that vehicle registered to him at that time?

4    A.    I believe so, yes.

5    Q.    And you wrote a report from that incident?

6    A.    Yes.

7    Q.    Do you have it with you?

8    A.    I have it in front of me.

9    Q.    Okay.  Very good.  And when you contacted him, what

10   happened?

11   A.    You want, like, a chronological?

12   Q.    Well, first of all, did he roll down the window or

13   what?

14   A.    No.  He opened the door, because the window was not

15   working.  It was not operable, so he opened the door so we

16   could communicate.

17   Q.    And he indicated that to you?

18   A.    Yes.

19   Q.    And when he did that, you saw that he had a sheath

20   knife on him in the passenger compartment?

21   A.    Yes.  It was, I believe, in the door compartment; the

22   door panel.

23   Q.    And you then asked if he had any other weapons or

24   knives on him?

25   A.    That is correct.

Stenzel - D

1    Q.    And he pointed out that he had a pocketknife in his

2    pocket?

3    A.    Yes.

4    Q.    And he complied with your request to exit the vehicle?

5    A.    Yes.  I asked him if I could pat him down for weapons.

6    Q.    And he complied with that?

7    A.    He did.

8    Q.    And he asked -- you asked for the knife and you took

9    it?

10   A.    I seized the knife, yes.

11   Q.    And were you with another officer at that time?

12   A.    I had a cover officer.

13   Q.    Meaning?

14   A.    Oh, I'm sorry.  A cover officer, meaning, yes, another

15   officer that was there with me.

16   Q.    In his own vehicle or with you in your car or what?

17   A.    No.  They had their own vehicle, but they were out of

18   the vehicle standing in my proximity to assist.

19   Q.    And after you got him out of the car, you asked him to

20   move away from the vehicle?

21   A.    Yeah.  We went to the rear of the vehicle.

22   Q.    And he complied with that request?

23   A.    Yes, he did.

24   Q.    And you asked him if he had any other weapons besides

25   the two knives that you had seen; correct?

Stenzel - D

1   A.   Yes.  That's correct.

2   Q.   And his response was?

3   A.   I believe that he said specifically --

4   Q.   He said you'd need a warrant; correct?

5   A.   Yeah.  It got to the point where I asked to look in the

6   vehicle, and he advised me that -- not without a warrant.

7   Q.   And you responded to him by saying, in your report,

8   quote, that wasn't entirely accurate, and since I have not

9   yet arrested you -- you have not yet arrested him for

10  anything, there was a possibility he may return to his

11  vehicle?

12  A.   That's correct.

13  Q.   What did you mean by that, when you said, "I had not

14  yet arrested you"?

15  A.   Well, I was concerned about if he was to return back to

16  the vehicle that he would have access to weapons in

17  wingspan.  And had he been arrested, he would be secured in

18  the back of my vehicle.

19  Q.   After, he needed to get some insurance documents,

20  right, register and whatnot?

21  A.   As part -- yes.

22  Q.   And he gave you permission to go into the glovebox to

23  get documents?

24  A.   That's correct.

25  Q.   And you did that?

Stenzel - D

1    A.    Yes.

2    Q.    You got some documents?

3    A.    I did.

4    Q.    And there had been a female passenger in his car;

5    correct?

6    A.    Correct.

7    Q.    And, by that time, she had gotten out?

8    A.    Yes, she did.

9    Q.    And she left?

10   A.    She was free to go.

11   Q.    And she did leave?

12   A.    She did.

13   Q.    Now, in your report, you indicated that you then

14   conducted what you called a, quote, "wingspan search"?

15   A.    Yes.

16   Q.    What do you mean by a "wingspan search"?

17   A.    Wingspan is any items that are accessible from sitting

18   in the driver's side of the vehicle that could be easily

19   obtained or reached for.

20   Q.    About how long had you been with Mr. Johnson on the

21   scene there before you conducted this wingspan search?

22   A.    I honestly don't recall.

23   Q.    You had already examined -- you talked to him first

24   about weapons; correct?

25   A.    Correct.

Stenzel - D

1  Q.   You had gotten the knife from him?

2  A.   Correct.

3  Q.   You had talked to the female passenger?

4  A.   Yes.  I believe so, yes.

5  Q.   And you had looked inside for documents and retrieved

6  documents?

7  A.   That's correct.

8  Q.   And you looked at those?

9  A.   I believe -- I don't recall if I looked at them at that

10 point, other than on their face.

11 Q.   Okay.  We're talking about a few minutes, though?

12 A.   Yes.  Yes.  I would say less than five minutes.

13 Q.   And you hadn't yet arrested Mr. Johnson; correct?

14 A.   Correct.

15 Q.   Did you think that you had probable cause at that point

16 to search the vehicle?

17 A.   I was -- again, if Mr. Johnson was to return to the

18 vehicle, I was concerned, based on mitigating factors, that

19 there could potentially be weapons there.

20 Q.   You were doing that for officer safety purposes?

21 A.   Correct.

22 Q.   Okay.  Not because you had probable cause to search for

23 something?

24 A.   I was not -- at that point I was not operating under

25 probable cause.  I was operating under officer safety.

Stenzel - D

1  Q.   And while you were -- while you were searching the car,

2  where was Mr. Johnson?

3  A.   He was -- my -- my cover officer, my partner, was

4  standing with him.

5  Q.   And that was to -- for your protection?

6  A.   Right.

7  Q.   And to maintain some degree of control over

8  Mr. Johnson?

9  A.   Correct.  Because I could not focus my attention on two

10 things at once.

11 Q.   Your cover officer was Officer Hertzler?

12 A.   Yes.

13 Q.   Had other officers arrived at the scene at that point?

14 A.   I don't recall any other officers.

15 Q.   Did you call for assistance?

16 A.   I don't recall.  Other than calling for

17 Officer Hertzler.

18 Q.   Now, if Mr. Johnson were to return to the car, that

19 would have been up to you; correct?

20 A.   It was my discretion, yes, at that point.

21 Q.   Not up to him?

22 A.   No.

23 Q.   Now, at the point that you seized the knife, did you

24 think that it was contraband for him to possess?

25 A.   I hadn't -- I don't recall examining it at that time,

Stenzel - D

1    at that point, to where I removed it from his person.

2    Q.    But you weren't really contemplating letting him go,

3    were you?

4    A.    Could you rephrase the question?  Letting him go?

5    Q.    Well --

6             THE COURT:  Were you contemplating it, is what he

7    asked.

8             THE WITNESS:  Letting him go, in terms of leaving

9    the scene, or letting him go without issuing a traffic

10   ticket?

11   BY MR. LEWIS: (Continuing)

12   Q.    Were you contemplating on giving him a ticket and

13   sending him on his way?

14   A.    Yes, I was.

15   Q.    If you had done that, you would have had to give him

16   back his things; right?

17   A.    Correct.

18   Q.    Including the sheath knife?

19   A.    Correct?

20   Q.    If I might take a look at this.

21            MR. LEWIS:  Do you have the sheath knife there?

22            MS. BOLSTAD:  I do.

23   BY MR. LEWIS: (Continuing)

24   Q.    It's not marked, but do you see the knife I'm holding?

25   A.    Yes.

Stenzel - D

1  Q.   This is the knife Mr. Johnson had, as far as you know?

2  A.   As far as I know, yes.

3  Q.   Would it help if you looked at it closer?

4  A.   No.  I can see it fine.

5  Q.   Okay.  Now, that was not illegal for him to have;

6  correct?

7  A.   Correct.

8  Q.   So if you were to -- so it was possible for you to

9  write him a ticket and send him on his way and give him back

10 the knives; correct?

11 A.   That's correct.

12 Q.   So you didn't feel that endangered by Mr. Johnson at

13 that time?

14 A.   I wouldn't equate the sense of danger with whether or

15 not I had probable cause to take him to jail or not.

16 Q.   Pardon me?  I'm sorry?

17 A.   I wouldn't equate the sense of whether or not I had

18 relative danger, whether or not I had the subjective belief

19 of danger, with whether or not I had probable cause to

20 arrest him.

21 Q.   Oh, I'm not confusing the two.

22 A.   Yeah.

23 Q.   So you felt endangered, but you didn't have probable

24 cause?

25 A.   Yeah.  Without examining the knife I seized from his

104

Stenzel - D

1  person, I did not have probable cause.

2  Q.    So you arrested him.  And in the course of searching

3  the car, you found a pipe; correct?

4  A.    Correct.

5  Q.    And is that what prompted you to then arrest him?

6  A.    I believe that if memory -- I'll refer back to my

7  report if it was regarding the knife or for the drugs.  I

8  believe it was for the drugs I found, and I -- it's

9  regarding the narcotics that I found.

10  Q.    Thank you.  I have -- oh, I -- when you -- you found

11  the narcotics, that was in a safe?

12  A.    Well, the -- the pipe was in an open container.  It was

13  in a -- it was a bag -- let me see how the bag was

14  described.  It was a black leather drawstring bag that --

15  the top of the drawstring was open to view.  And peering

16  through the open view, I believe I saw what I believed at

17  that time to be a glass meth pipe.

18  Q.    This was at -- your encounter with him, was that at

19  about 5:31 p.m.?

20  A.    This is 17:31.

21  Q.    I'm sorry.  5:31 p.m.

22  A.    Yeah.  So about 5:31 p.m.

23  Q.    It was no longer Daylight Savings Time; correct?

24  A.    I don't recall if it was Daylight Savings Time.

25  Q.    It would have been around Thanksgiving time.

Stenzel - D

1    A.    Correct.

2    Q.    So it would have been dark?

3    A.    It was.

4    Q.    Would you use a flashlight, then, to see what was

5    inside things?

6    A.    I always use a flashlight, yes.

7    Q.    That allowed you to see through the drawstring bag?

8    A.    It was open to view.

9    Q.    It allowed you to see inside the drawstring bag?

10   A.    It illuminated the interior compartment, which allowed

11   me to see inside the bag.

12   Q.    Okay.  With your light, you mean?

13   A.    Correct.  Yes.

14   Q.    And then you searched further and found a safe?

15   A.    Uh-huh.

16   Q.    Two safes?

17   A.    Correct.

18   Q.    And you used a key or a screwdriver, or something, to

19   open the safes?

20   A.    Correct.

21   Q.    And that's where you found drugs and a gun?

22   A.    Correct.

23              MR. LEWIS:  I have no other questions.

24              THE COURT:  What about the stun gun?

25              THE WITNESS:  The stun gun?

Stenzel - X

1          MS. BOLSTAD:  Judge, to clarify, all of these

2    questions to Officer Stenzel are from 2009.

3          THE COURT:  Oh, thank you.  There wasn't any stun

4    gun in 2009.  Thank you.

5          MS. BOLSTAD:  Just a couple of questions.

6

7                    CROSS-EXAMINATION

8    BY MS. BOLSTAD:

9    Q.   Officer Stenzel, are you aware if Mr. Johnson was

10   prosecuted for the items that you found in his car?

11   A.   Yes.

12          MR. LEWIS:  Objection.  Relevance, Your Honor.  It

13   has nothing to do with the legality of the search.

14          MS. BOLSTAD:  It has everything to do with

15   Officer --

16          THE COURT:  I didn't ask you for a response.  Just

17   ask him to -- the question.

18   BY MS. BOLSTAD: (Continuing)

19   Q.   Are you aware if Mr. Johnson was prosecuted for the

20   items you found in the 2009 search?

21   A.   Yes.

22   Q.   Was he convicted of felon in possession of a firearm

23   from what you found?

24   A.   Yes.

25          MR. LEWIS:  Objection.  Relevance, Your Honor.

Stenzel - X

1          THE COURT:  Overruled.

2     BY MR. LEWIS:  (Continuing)

3     Q.    And I'd like to show you -- I'm showing you a LEDs

4     printout of criminal history.  Do you recognize that

5     document?

6     A.    Yes.

7     Q.    And is that Mr. Johnson's criminal history?

8     A.    Yes, it is.

9     Q.    Does that reflect a conviction for felon in possession

10    of a firearm based on an incident date of November 27, 2009?

11    A.    Yes.

12    Q.    Is that the kind of information that is available to

13    other officers long after your work is done?

14    A.    Yes.

15    Q.    So, for instance, Officer Corona has access to that

16    criminal history at the time he's applying for a warrant?

17    A.    That's correct.

18    Q.    And that information reflects that Mr. Johnson was

19    convicted of the offense?

20    A.    Yes, it does.

21    Q.    Okay.  It nowhere indicates that the evidence was

22    suppressed from any motions or anything like that?

23    A.    It does not.

24          MS. BOLSTAD:  Okay.  Nothing further.

25          THE COURT:  Okay.  Thank you.

Stenzel - ReD

1        Anything further?

2

3                    REDIRECT EXAMINATION

4    BY MR. LEWIS:

5    Q.    He got probation on that; right?

6    A.    It looks like here sentenced to 18 months jail with

7    institution provision and post-prison supervision.

8    Q.    That was after a probation violation?

9    A.    Yeah.  It says here:  Count 1.  Felon in possession of

10   a firearm.  18 months' jail.  Convicted felony.

11              THE COURT:  You're shaking your head.

12              MR. LEWIS:  I don't think that that's correct, but

13   I -- I don't know how relevant that is, in any event.

14        I have no other questions.

15              THE COURT:  Thank you.  Thank you, sir.

16              THE WITNESS:  Thank you.

17              MS. BOLSTAD:  Your Honor, I'll move to admit that

18   exhibit as Government's 1 for today.

19              MR. LEWIS:  I still believe it's irrelevant, but I

20   recognize the Court has ruled.

21              THE COURT:  That's fine.

22              MR. LEWIS:  I do believe there's information on

23   that that should be redacted; social security numbers and

24   things of that nature.

25              THE COURT:  It's not going anywhere.

Stenzel - ReD

1    MR. LEWIS:  Thank you.

2    THE COURT:  Okay.  Well, is that the rest of your

3 case?

4    MR. LEWIS:  I have no other questions, Your Honor.

5 I have no other witnesses.

6    THE COURT:  Thank you.  Do you want to put on some

7 witnesses?

8    MS. BOLSTAD:  Your Honor, I -- I don't see the

9 need for any further testimony in this matter.

10    THE COURT:  Very well.  I'll entertain argument.

11    MR. LEWIS:  Your Honor, I'll start with the easy

12 part first.  It's axiomatic that evidence gathered from an

13 unlawful search cannot be used to bolster a subsequent

14 search.  Information gathered in 2009 was used to bolster

15 the 2014 search.  It's vital information to the search

16 warrant.

17    Officer Stenzel testified that he did not have probable

18 cause to search the vehicle, and he also testified that

19 Mr. Johnson was not under arrest at the time.  It can't be

20 search incident to arrest, it wasn't done with consent, and

21 it wasn't done with probable cause.  And even if it -- if he

22 had been under arrest, it still wouldn't be a search

23 incident to arrest, because, under *Gant v. Arizona*, which

24 was handed down prior to this incident in 2009.

25    Taking aside completely the issue of whether the knife

was lawful to possess, this officer, himself, didn't even
know if it was lawful.  He was -- he didn't -- hadn't yet
decided if he was going to write him up a ticket for the
traffic infraction and send him on his way with the knives
that the Court has seen.  So I think it's -- it's clear that
it was an unlawful search.  The 2009 evidence cannot be used
to support the 2014 warrant.

     I think the real question before the Court is whether
the evidence that Officer Corona gathered, taking apart
anything gleaned from the Stenzel incident in 2009, is
sufficient to support probable cause.  And what we have
there, really, is a pipe, which he says has residue and
scorch marks.  I don't see it.  The Court can look at it and
make its own determination.  They look like scratch marks to
me.  But we don't have anything in the search warrant
affidavit that says that it -- that he knows, from his
experience and training, that people who have pipes with
residue carry more drugs in their car.

     And one case cited by -- by both parties is an
unpublished decision, which we brought up because we're
under an obligation, I think, to bring to the Court's
attention things that might go against us, is *US v. Griffin*.
I forget the year.  I think it was 2012.  I could be wrong
on that.  But there the Court relied heavily on the fact
that the officer had said in his affidavit that based on his

experience people keep -- if they have residue, they
therefore have drugs in their car.  That wasn't in this
affidavit.  He talked about other things, but not in the
car.

       And, furthermore, I think that it's a stretch to say
that even if he thinks that people often have drugs in their
car, they could have drugs anyplace.  The evidence that the
government has pointed to having lots of money, that doesn't
mean you're going to have drugs in the car.  A stun gun
doesn't mean anything.  The fact that he's been driving
around doesn't mean a lot.  And the government has talked
about the short visit to somebody's house.  Officer Corona
testified that he had been there for at least 20 minutes.
That's not drug dealing kind of activity necessarily.  If
you stop in front of somebody's house, they run out, and
there's an exchange, and they go on, okay; but we don't have
that here.  We have no other information.

       This is -- this is an extraordinarily thin affidavit
when you take out the clearly -- I think it's almost
impossible to argue otherwise -- illegal search of 2009.

       I'm not putting down Officer -- Detective Stenzel.  He
seems like a nice person.  I'm glad he's on the force.  He's
straightforward, but he was candid.  He said he didn't have
probable cause.

       So we're stuck with paring down that affidavit to the

barest things that can only be unrelated to the 2009 arrest.
That's pretty difficult to do, because it's just permeated
with that.  So that's what it comes down to on the motion to
suppress.

I've made my arguments with respect to the *Franks*
motion.

The -- the Court has to examine the pipe.

As far as the issue of the knife being illegal to
possess, it's almost a moot issue, because 2009 goes away
with this officer saying he didn't have probable cause,
didn't think he had probable cause, and was searching it
just to make sure there was no weapons; he still might let
him go.

But the testimony is that this is a pocketknife.  I
can't imagine that Kershaw, this big company, makes a knife
that countless people purchase -- sportsmen, fishermen,
sailors -- people who work in factories use that, and the
only difference that's going to make it legal for you to
carry it is if you have a clip that's covered by your jacket
or anything else.

It's -- if they arrest people and they get convicted,
somebody is not doing their job right, frankly, because
nobody is challenging that.

This is an ordinary pocketknife in so many ways.  It's
a very common knife to buy in a heavy sporting goods store

1    around.

2        So the -- and Officer Corona also seems like a very

3    nice guy.  But what he did in this case was to gild the

4    lily.  The Court has before it one of the exhibits, Officer,

5    now Detective, Stenzel's report.  I would urge the Court to

6    go through that.  The arguments that the government is

7    making that Officer Corona could take Stenzel's report and

8    glean from it these things of commonly in the vehicle,

9    multiple incidents of having guns and/or drugs in the safe,

10   just aren't there.  Just aren't there.

11       The part we refer to in this other report, it's on

12   page 5, the first full paragraph.  The Court can see -- it

13   said that Mr. Johnson was chatty and said he wasn't worried

14   and he said that the DA's office dropped it last time.

15   Parentheses referring to PPB case number such and such.  And

16   that's it.  I don't know how you glean from that that this

17   is another incident of guns and/or drugs in the safe.

18       So you can't do that when you apply for a search

19   warrant.  You have to be perfectly straight and upfront.  I

20   think the officer should have done some more work when you

21   see somebody say in the report that he's backing off, trying

22   to distance himself from being a membership in this gang --

23   I'm not sure how relevant the gang membership is in the

24   first place, but he thought it was, and he's trying to

25   bolster this otherwise thin affidavit, and he knows that

some people do have to distance themselves, some people do

drop out, and some people are just blowing smoke.

Absolutely, there are people.  But it's not up to him.  It's

up to the magistrate to have all the information and not

just the information that the officer wants the magistrate

to have.

And that's why the *Franks* motion is also valid.  And

that's why it also makes inapplicable the *Leon* good faith

exception if the Court were to find no probable cause in the

affidavit.

I think I've hit all the important points.  I've

briefed the heck out of it.  I'm not going to go through

everything that I've written.  I know the judge has read

that stuff and will be studying that further.  But if the

Court has any questions, I'll be happy to entertain them.

THE COURT:  No.  Thank you very much.

MR. LEWIS:  Thank you.

THE COURT:  Counsel?

MS. BOLSTAD:  Thank you, Your Honor.

I think it's important to distinguish between the

different searches of Mr. Johnson that have occurred here,

because you've heard a lot of evidence today about 2009

versus this case, 2014.

So to clarify, there were two Portland police cases in

2009.  One of which Officer Stenzel just testified to.  His

1    report from that incident was submitted to the Court as

2    Exhibit B of the defense motion.  So the Court has the

3    six-page report.  In that report of 2009, Officer Stenzel

4    references another separate 2009 incident where on page 2 of

5    that report he says that he's aware in that other case,

6    which is PPB 09-32495 Mr. Johnson keeps his gun and drugs in

7    a safe.  That's before Officer Stenzel.

8        Then Officer Stenzel, on November 27th, stops

9    Mr. Johnson, and, again, he is found with a safe with a

10   firearm and methamphetamine.  So those two incidents are

11   really historical.  The 2014 case where he's stopped by

12   Officer Corona, we find a safe in the trunk of the car.  The

13   safe contains methamphetamine.  No firearm.  So, factually,

14   those are the three different searches being discussed.

15       Mr. Lewis spends a lot of time talking about the 2009

16   search by Officer Stenzel being illegal.  There's no

17   evidence that it's illegal; just Mr. Lewis's argument.

18   Mr. Johnson was convicted of the very offense that Mr. Lewis

19   is saying was an illegal search.  So he's trying to litigate

20   that issue anew here in front of Your Honor.  But I think

21   for probable cause in the search warrant what's important

22   for this Court to think about is what was Officer Corona's

23   understanding of that 2009 incident from Officer Stenzel?

24   And Officer Corona testify that he summarized

25   Officer Stenzel's stop of Mr. Johnson.  And we know that

116

Mr. Johnson got convicted from that offense.  And so as a reasonable law enforcement officer, I think it's perfectly permissible for Officer Corona to rely on that history about Mr. Johnson.

There's no evidence that it should have been known to Officer Corona that that stop had any illegality to it and none has been proven here today.

Putting aside the historical facts, though, even if we put them aside, this affidavit written by Officer Corona in 2014 has probable cause to search the vehicle for drug possession, that is because Officer Corona, as listed in the government's response, talked about many facts.  The most important one being he found a meth pipe in Mr. Johnson's vehicle with methamphetamine residue.

THE COURT:  Let's stop.  Let's go to the beginning with the why -- why was the car stopped and what reason did they have to stop it and what did they do step by step. Let's not just jump into something that follows that.

MS. BOLSTAD:  Absolutely, Your Honor, let's go over the 2014 stop.  We know that officers were aware that this man had an outstanding arrest warrant.  They observed him driving a vehicle.  They decided to call for help.  They boxed in his vehicle to arrest him on the outstanding arrest warrant.  That's not contested.  It's not contested that he is the person who had the arrest warrant.

So in stopping him and taking him from the vehicle to arrest him, they conducted a search of his person.  And on his person officers found the Kershaw knife, the 1990 model. Officer Corona showed you that knife and how it swings into position very quickly by simply pushing a thumb button on the top of the knife.  Officer Corona testified that it is illegal for felons, like Mr. Johnson, to possess such a weapon.

He was going to be arrested anyway, but that's another new crime in state court:  Possession of a restricted weapon.  The definition of a restricted weapon is included in the government's response, in a footnote.  Number one, on page 2.  "And the reason why this weapon is a restricted weapon is because it has a blade that projects or swings into position by force of a spring or by centrifugal force."

You heard from a defense witness that this Kershaw blade uses a torsion bar, which the witness testified is a type of spring.  You heard Officer Corona that he's arrested multiple people for having these knives, and it's never been a problem for him.  It's never been suppressed.  It's never been found in this experience that this knife is not, in fact, a restricted weapon.  There's no case law that establishes that it does not count.

So after finding the knife on Mr. Johnson's person, they also found in his back pocket $7,100 in cash.  And this

1   is all pursuant to the search incident to arrest, searching

2   his person.

3       Officers seized those items as evidence, because $7,100

4   carried by a felon, who also has a knife, strikes them as

5   important.  They asked him why he had $7,100, and he gave an

6   incredible answer, which is, "I'm on my way to buy a car."

7   He had no idea what kind of car, from whom he would buy, or

8   where he would buy.  So that struck the officers as

9   important.

10      Because his vehicle was stopped away from the curb

11  and --

12              THE COURT:  And that he had inherited the money?

13              MS. BOLSTAD:  Yes.  That's an additional fact.  He

14  stated that he had inherited the money.

15              THE COURT:  And in small dimensions?

16              MS. BOLSTAD:  In hundred and 20-dollar increments.

17  Exactly.  And it was folded in such a way to strike them as

18  suspicious.

19      Officers learned that this man was driving uninsured

20  and unlicensed.  There was no one else to drive that car

21  away.  It was sitting there in the street, creating a hazard

22  for the other drivers, as the officer testified.  In that

23  circumstance, they made the decision to impound the vehicle

24  and call for a tow.  When that decision is made, they follow

25  a very strict policy.  The inventory policy, which I have

1    submitted with my response brief as an exhibit.

2        In following that policy, they are not allowed to open

3    closed containers.  They are allowed to sweep the vehicle as

4    they did in this case.

5        But, stepping back, before they did the inventory, they

6    called Deputy Swail with the drug dog, and you heard about

7    that today.  The vehicle was not opened yet.  Mr. Johnson

8    was located in a patrol vehicle, away from the car, and

9    Deputy Swail ran his dog, Ellie, around the vehicle, and she

10   did not alert.  That's when the inventory search began.

11            THE COURT:  I thought we -- we agreed we were not

12   going to use that term, "inventory search."  They're

13   authorized to do an inventory and record the inventory.  And

14   I still remember Justice Linde with great force, saying:

15   It's not a search.  It can't be a search.  You're not

16   searching for inventory.  What's inside of it is inventory.

17   You're just inventorying, and whatever you get you get.

18            MS. BOLSTAD:  Good clarification.  My apologies.

19            THE COURT:  Well, you've done well on that.  I

20   think I mentioned that last time.

21            MS. BOLSTAD:  Very good, Your Honor.  They

22   conducted an inventory of the vehicle.  In the inventory,

23   they found items that were of concern.

24            THE COURT:  Right.

25            MS. BOLSTAD:  A stun gun on the floor right where

120

he had been sitting, the floorboard of the driver's seat.  A

stun gun is a very dangerous weapon.  They found in the

inventory a methamphetamine pipe right behind the pocket of

the passenger seat.  They observed that that methamphetamine

pipe had white residue, which is still visible today, in the

exhibits presented today by the defense.

Now, the defense submitted you a picture of that

methamphetamine pipe on whitish paper, and it's much harder

to see the residue in the picture presented by the defense;

but, with your naked eye, and, as Officer Corona testified,

you can see the white powdery residue in that pipe.

Officer Corona, after inventorying the vehicle and

seeing those things, also opened the trunk of the vehicle,

as he is required by the policy, and observed two bags, a

duffle bag and a backpack.  He seized those items in order

to apply for a warrant.  He had reasonable suspicion at that

time to seize those bags, thinking they might contain

evidence of a crime.  And not just a drug crime.  He was

looking as evidence that this man, in fact, possessed the

weapons at issue in the car, as his warrant asks permission

to search for packaging materials for the stun gun or any

accouterments associated with the stun gun to plug it in,

et cetera.

He didn't open those bags.  He followed the policy.  He

simply seized those bags, so he could go back to work and

apply for a search warrant later.

When he applied for that warrant, he included the facts, both historical and present day, and, based on those totality of circumstances presented in the facts, the government submits there was aplenty of probable cause to search the bags. That was based on Mr. Johnson's criminal record, his warrant status, and membership in EK, the fact that he had been found before with a vehicle carrying weapons and drugs, the fact that he is doing things that are against the law. Just driving that car without a license and without insurance, he's already breaking the rules, and he's in warrant status for breaking other rules.

His statements made no sense. They were incredible to the officers. This large amount of cash for someone who's in warrant status and no indication of legitimate employment was also suspicious.

He didn't know the name of the owner of the vehicle. That's a red flag. If he can't name the person who owns it and has no way of contacting that person. And, finally, just the bags itself, when Officer Corona described those bags, he said the Dakine backpack was quite heavy and it appeared to have something large and boxy at the bottom.

He testified, under oath, that at the time he removed the bags from the car Officer Corona had not -- he had not read the 2009 report. So he wouldn't have had the purpose

1    of trying to hear that metallic clink and look for a safe.

2    He didn't read those reports until later.

3         So that's the sequence events and what led to them

4    applying for a search warrant to get into those closed

5    containers seized in the inventory.

6         Officer Hernden signed off, agreed there was probable

7    cause, and enabled them to search the bags and this man's

8    cell phone for evidence of drug possession.

9         I want to address a couple of the arguments made by the

10   defense.  First, he said there was nothing in the search

11   warrant affidavit to suggest or explain to the judge that

12   drug users -- so, for instance, people with methamphetamine

13   pipes -- are likely to have drugs in the car.

14        So let's be very clear.  This was not a search warrant

15   to search the car.  This was a search warrant to search two

16   bags.  And in that search warrant affidavit, at page 5 of 6,

17   the top paragraph, Officer Corona made the statement in his

18   affidavit that persons in possession of illicit substances

19   will more likely, than not, conceal those substances in many

20   places, including safes, secret compartments, bags, and

21   backpacks.  So that's the link.  He says, "I know that

22   people who use drugs, they store those drugs in places that

23   are secret, like bags and backpacks.

24        So it makes sense to apply for a warrant for a backpack

25   that just happened to be in a car he was driving.

1    Mr. Lewis also talked about why he -- the Kershaw knife

2  is not an illegal knife.  I think that he's just going to

3  have to agree to disagree with these law enforcement

4  officers who testify and who showed the Court that this

5  blade swings into place by force of a spring.  No action is

6  required on the part of the user, other than pushing the

7  thumb button.  It's an illegal weapon, and this warrant

8  shouldn't be eliminated simply by Mr. Lewis's disagreement

9  on what kind of knife it is.

10    He argued it's such a common knife.  It's so common,

11  how can it be illegal?  Well, as the Court is aware,

12  firearms are very common.  You can buy a firearm at any

13  number of sporting goods stores.  What makes it illegal is

14  when it is possessed by a felon.  So that's why this knife

15  is illegal.  I can possess it.  Nonfelons can possess it,

16  open; but once we have a felony conviction, we're not

17  allowed to possess such weapons.

18        THE COURT:  You couldn't possess it if it's in

19  your pocket?

20        MS. BOLSTAD:  If it's concealed, that's a lawful

21  violation.  It needs to be open and apparent.  So I would --

22  I would keep my knife on the outside of my belt --

23        THE COURT:  Yeah.

24        MS. BOLSTAD:  -- if I were to do such things.

25    As to the *Franks* hearing, Your Honor, I'm glad we took

1   testimony today on that.  Officer Corona testified he made a

2   mistake.  It's not the first mistake ever committed by a law

3   enforcement officer, but he owns it.  He knows he should

4   have included the dog sniff, the lack of alert in his

5   affidavit.  He failed to do so.  He was not trying to

6   mislead the -- the issuing judge by hiding that fact.  He

7   simply forgot to include it.

8        But after Officer Corona testified, the Court heard

9   from Deputy Swail.  Because your job, under *Franks*, is to

10  decide, if there is a material omission, if we put that

11  omission into the warrant, does the warrant still have

12  probable cause.  And the answer that Deputy Swail helped

13  provide is the fact of a nonalert by a dog to the exterior

14  of a vehicle, it just simply is not that big of a deal.

15  He's only had three positive alerts out of I think he said

16  300 exterior sniffs by his dog in a six-year period.  He has

17  found drugs in a vehicle when the dog did not alert.

18            THE COURT:  I've heard enough on the dog.

19            MS. BOLSTAD:  Okay.  The government is simply

20  conceding that that fact should have been in the warrant

21  affidavit, but including it now does not remove probable

22  cause.

23            THE COURT:  Okay.

24            MS. BOLSTAD:  I would ask the Court, in its

25  findings today, to please make credibility findings about

1    the officers who have testified and to make findings about

2    the methamphetamine pipe, which is an exhibit in front of

3    you, and what can be seen, so the Ninth Circuit knows what

4    we're all looking at.

5             THE COURT:  Thank you.  Any response?

6             MR. LEWIS:  I would like to respond to a couple of

7    things, but first I would also confess my guilt.  I too have

8    used the phrase "inventory search," but I am proud to say

9    that since I was admonished about 38 years ago not to say

10   "short witness," I've always said "brief witness."

11            THE COURT:  Yes.

12            MR. LEWIS:  The --

13            THE COURT:  Did a short judge tell you that?

14            MR. LEWIS:  I can't recall offhand.  I think it

15   was a pretty big judge, to me.

16        The -- some people carry cash.  The fact that a felon

17   is carrying cash is of no consequence.  The fact that

18   they're smaller bills, just because they're inherited --

19   people don't generally inherent cash money.  They

20   inherent -- if they inherit money, they get a check.  The

21   check is negotiated.  It gets cashed.  And they carry money.

22   If they're going to carry large sums, they carry large sums.

23   Maybe in smaller denominations.  That doesn't always mean a

24   whole lot.

25        As far as the inventory goes, there wasn't any

1   evidence, that I saw, offered today about what the

2   inventory -- we haven't seen the inventory policy.  But the

3   policy that was referred to was the Portland policy.  This

4   is a search that took place in Clackamas County; in

5   Gladstone.  I don't know what the policy is there.  I don't

6   even know what -- what inventory is supposed to be followed

7   there.  All we know is what Portland -- we heard something

8   about what has to happen in the city of Portland.  They were

9   outside the city of Portland.  They were outside Multnomah

10  County.  I would think that when people pass laws they pass

11  laws to take place in their jurisdiction, not someplace

12  else.

13        So that's one point I wanted to make.

14        As far as the residue goes on the pipe, I'll confess I

15  took the picture and I hadn't even realize it was going to

16  be important until afterwards, when I was thinking about

17  what I had seen and not seen on the pipe.

18             THE COURT:  It doesn't make any difference.  I've

19  seen the pipe.

20             MR. LEWIS:  Okay.  The last thing I wanted to talk

21  about, and I'll do it briefly, is these other reports.

22  Well, Your Honor has Stenzel's report.  It doesn't say

23  anything about what had happened before.  And the reference

24  that counsel made on page 2 of Stenzel's report also isn't

25  of help.  The -- it says -- you know, also referenced PPB

1    case number.  It doesn't say what happened in that case

2    number.  It doesn't say anything about that.

3         And I received that yesterday.  It's not a proper --

4    it's improper, I think, for me to go into it here, but

5    there's -- there's nothing here that would clue in

6    Officer Corona as to what happened or didn't happen then.

7    So that's an important point.

8         And I think that counsel's argument here is simplify

9    incorrect to say that this supports this idea of multiple

10   reports showing that he commonly has contraband in a safe in

11   his vehicle.  There's three or four things right there that

12   had been thrown in there maybe recklessly, maybe

13   intentionally, I don't know, but if you have the report and

14   you -- you're referring to it when you're drafting a very

15   important document, that is a search warrant affidavit, and

16   you take it seriously, and you -- and you want to be totally

17   up front with the Court, you study this carefully and

18   especially when you're using adjectives, modifiers.  That's

19   what he did here.  He put those in there, and they weren't

20   correct.

21        I think that is all that -- I was going to mention the

22   dogs.  The Court has heard enough of that.

23        Judge, I've set out everything that I can in the -- in

24   my pleadings.  I'm not going to repeat them here.

25             THE COURT:  Okay.  Thanks.  First of all, I want

1  to compliment both counsel for doing terrific jobs for your

2  clients.  I anticipated that you would.  And you didn't

3  disappoint me in any way.  The -- I've listened very

4  carefully to the evidence, and I will make my findings of

5  fact and conclusions of law so that they will be in formal

6  form, but, in short, I've -- I've granted you a *Franks*

7  hearing.  You don't have anything else you can put on.

8           MR. LEWIS:  Pardon me, Your Honor?

9           THE COURT:  I essentially granted you a *Franks*

10 hearing.  You haven't anything else to put on, do you?

11          MR. LEWIS:  I agree we've had a *Franks* hearing and

12 I have nothing else to put on.

13          THE COURT:  So that motion for a *Franks* hearing is

14 allowed.

15     And on the basis of the *Franks* hearing, the motion you

16 want to suppress specifically -- would you state for the

17 record what you want to suppress?

18          MR. LEWIS:  Well, Your Honor, ultimately, what

19 we're trying to suppress is all the evidence gathered in

20 2014, which would be -- that is all the evidence that was

21 gathered --

22          THE COURT:  I want to know if it's beyond the

23 enclosed containers.

24          MR. LEWIS:  We're seeking to suppress everything

25 gathered in 2014; but, in particular, and the most important

1  thing in this case, is -- is what was found in the bag or

2  bags in the trunk.

3       THE COURT:  That's what I thought your motion was

4  directed to.

5      What was your position on that?

6       MS. BOLSTAD:  We'd ask you to not grant the motion

7  to suppress.  I think --

8       THE COURT:  I know that.  I'm just talking about

9  what -- what do you perceive the defense is trying to

10 suppress?

11      MS. BOLSTAD:  Everything seized in 2014,

12 especially the items from the bags in the trunk.

13      THE COURT:  All right.  Well, first of all, the

14 motion to suppress can be denied.  The -- there was -- the

15 police officers knew -- had identified this defendant.  They

16 knew that there was a warrant for his arrest.  Therefore,

17 they had a right to stop the vehicle and to interview the

18 defendant and to make a standard vehicle stop search.  They

19 found evidence of crime.  Clearly, $7,100 in cash, in small

20 numbers, is very relevant that there had been criminal

21 activity.

22      Further, there was a pipe.  Whether you say it was

23 scorched or barely visible, it's still a typical drug

24 paraphernalia.  You knew that this -- they knew that this

25 person had been a member of the -- this white supremacist

gang.  That gangship is just kind of a backdrop.  It

doesn't, in itself, provide or not provide the fact that you

allegedly had withdrawn.  It just doesn't cut any ice either

way.

So then you go from the stop and the question of

whether this was a legal weapon or illegal weapon.  This is

a weapon that worked exactly like a switchblade knife that

you just touch it and it opens up and can stick anybody very

easily.  Nothing -- not a weapon that should ever be carried

by an ex-felon.

Technically, you can argue whether a torsion bar is a

spring device, but the inventor of the device said it was.

So within their own nomenclature of the known -- in the

knife business, it was a -- equivalent to a spring.

This gives ample probable cause for whatever they did

thereafter, and I will make my specific findings to back up

the remainder.

And the -- certainly finding a stun gun, which was in

the '14 search -- correct?

MS. BOLSTAD:  Yes.

THE COURT:  And was visible?

MS. BOLSTAD:  On the -- yes.  Visible on his

floorboard.

THE COURT:  A stun gun in possession of a felon,

is, to me -- is another crime.  The fact that he was in a

1  vehicle that -- for which he can make no excuse for being

2  in, not -- no possessories assigned that anybody had given

3  him to use the vehicle or where it came from, again raises a

4  high level of criminality.

5       But I'm -- putting that aside, we'll give you ample

6  record for your appeal on the motion to suppress, counsel,

7  and I will address the matters.

8       I don't even agree that the officer had to tell the

9  presiding judge that out of 300 and some searches that he

10  only had, what, five alerts, and -- it's just like saying,

11  well, we did a -- judge, you should know that we did a

12  dog -- exterior car dog search, but it came up negative, but

13  I want to tell you that it doesn't mean anything anyway

14  because it's such a rarity.  I don't think the officers have

15  to sit around and say everything that they did that

16  didn't -- wouldn't have turned anything up in the first

17  place.

18       I think it's unfortunate that they didn't use Ellie to

19  search the bags and the rest of the contents of the interior

20  of the vehicle.  That could have led to something.

21       Now, this will lead us to a trial time which is set for

22  the 18th.  And I really want to thank you both for getting

23  the stuff on a timely basis.  I can't tell you -- I have to

24  say that's a rarity, but so welcome.  And so I'd like to see

25  if you're prepared to go over some of the matters in the

1   nature of a final pretrial conference so we know where we're

2   going?

3           MR. LEWIS:  I think that I'm certainly prepared to

4   address the motions in limine today, Your Honor, which is

5   the main thing.

6           THE COURT:  You see that you've won most of your

7   points.  And, again, counsel I just had in the last trial,

8   and she did exactly the same thing.  We had another gang

9   member, and she just said right at the beginning, "We're not

10  offering evidence of gang membership."  Whether he was or

11  wasn't is not relevant.  You see in concession number one --

12  can you share this with your client, so he can see what

13  we're talking about?

14          MR. LEWIS:  Yes, I have a copy right here.

15          THE COURT:  I want the government's response to

16  the defenses -- defendant's motion in limine.

17      You see, the first thing the gang membership is out of

18  picture, unless -- you're not going to call any witnesses,

19  you said, and he's not going to take the stand?

20          MR. LEWIS:  Correct, Your Honor.

21          THE COURT:  Yeah.  Last trial, defense counsel

22  seduced us into thinking he was going to take the stand, and

23  we got all ready to follow that, and, with no notice he

24  switched blades and -- not switch -- wrong expression --

25  switched his position and didn't take the stand, and we had

1   a little glitch there that we had to cover.

2       Prior conviction of the defendant will not be ever

3   mentioned of the defendant.

4       And the investigative information is not going to be

5   offered.

6       And so the next thing is, is to -- there's

7   surveillance.  The fact that he had a warrant for his

8   arrest, they agreed to -- well, in essence, why don't you

9   just tell me -- you've trimmed this down very nicely, I

10  think, to cut out a lot of the stuff that might be

11  prejudicial.  You don't want to have any error.

12      I can clear up -- I think the stun gun is very

13  relevant.  I think the $7,200 is very relevant.  The fact

14  that he was driving with no insurance, no license, I don't

15  know if that's important on a -- whether he was in

16  possession of the drugs.  Because he's already been stopped,

17  they're not concerned with the legality of it, and there

18  won't be any "other bad acts" evidence needed in this case.

19  And, I don't know, the papers -- that might be all very

20  interesting for search warrant purposes, but right now we're

21  just talking about was he in possession of the stuff that's

22  not been suppressed?

23          MR. LEWIS:  Judge, which item were you talking

24  about just right then?

25          THE COURT:  I was talking about the last one on

1    the list.  I'll go through it again.  The reason why they

2    stopped him, has been sanitized.  They stopped him on a

3    warrant, without saying it's a parole warrant or anything of

4    that nature.  Right?

5              MS. BOLSTAD:  The government is prepared to state

6    it as -- exactly as stated; that they were stopping him on a

7    warrant, but leaving out the idea that it was parole.

8              THE COURT:  Right.  So they had reason to stop

9    him.

10             MS. BOLSTAD:  Right.

11             THE COURT:  And then we're leaving out the gang

12   situation.  We're leaving out the parole violation.  I'm

13   admitting the stun gun.  The -- certainly, the $7,200.  I

14   don't think the insurance or license is relevant.  And

15   there's no bad act evidence to be offered.  And the papers

16   in the backpack, you might have a reason for offering them.

17   And the search warrant we're not concerned with any longer.

18             MS. BOLSTAD:  Correct.  So the papers in the

19   backpack, I'd like to address that.

20             THE COURT:  That's fine.

21             MS. BOLSTAD:  This defendant is in a vehicle that

22   doesn't belong to him.  So I think the obvious defense, if I

23   were to be defending him would be, "Those are not my bags."

24             THE COURT:  Okay.

25             MS. BOLSTAD:  The papers within the backpack prove

1    that those were his bags, and I'm prepared --

2             THE COURT:  Okay.

3             MS. BOLSTAD:  I'm prepared --

4             THE COURT:  That's enough said.  Enough said.

5             MS. BOLSTAD:  Right.  The difficulty is the paper

6    talks about criminal cases.  So I'm prepared to inoculate

7    somehow so the jury doesn't hear he has a prior criminal

8    record.  But we need to come up with a stipulation as to

9    what those papers are.  And my proposal is that we say that

10   there's a stipulation that the parties agree paperwork

11   belonging to the defendant was found in his bag, but we are

12   not presenting the jury with that paperwork because it's his

13   private matter.

14            THE COURT:  Fair enough.

15            MR. LEWIS:  Yeah, in my notes it says "okay."  I

16   didn't want to interrupt counsel by --

17            THE COURT:  That's fine.  You have a great shot

18   cleaning this thing up, as you did in the last case.  All

19   this stuff is very interesting and relevant for one reason,

20   but not for a jury.  They want to know what he's charged

21   with.

22            MS. BOLSTAD:  So the only other topic I think that

23   we need to cover from these is the circumstances of arrest.

24   Counsel doesn't want us to talk about officers arresting him

25   at gunpoint and boxing him in, so we will keep out the

1    arresting him at gunpoint.  However, I think the facts --

2    they can't get around the fact that there were multiple cars

3    there from the police and how they maneuvered it appeared to

4    box him in.

5            THE COURT:  It doesn't make any -- add any

6    relevance to whether he's in the possession of drugs.

7            MS. BOLSTAD:  That's true.  I agree.

8            THE COURT:  So your motion will be granted.

9            MR. LEWIS:  Thank you.  Your Honor, I realize if I

10   open doors there could be problems.  I don't plan on opening

11   doors.

12           THE COURT:  I don't expect you to.  It's going to

13   be real clean.  Just --

14           MR. LEWIS:  Well --

15           THE COURT:  Go ahead.

16           MR. LEWIS:  Judge, there was one -- one section

17   here, which I -- at least one that I wanted to take issue

18   with, and that's Section 4, the surveillance.  The things

19   that counsel wants to put in:  He goes to Clackamas Inn

20   means he's a drug dealer.  He has a key to the Clackamas

21   Hotel.  He has clothes in a duffle bag.

22      I don't know what that has to do with anything.

23           THE COURT:  I didn't think we were going to offer

24   that.

25           MR. LEWIS:  Oh, I misunderstood.

137

1          MS. BOLSTAD:  I'm absolutely going to for the

2     reasons stated.  The backpack with the drugs, the defense

3     can say, "That's not my backpack."  But the fact that he was

4     in the backpack, there's a notepad from the Clackamas Inn,

5     drawing the circumstantial evidence that when they see him

6     coming from the Clackamas Inn, that's his backpack.

7          THE COURT:  Are you going to make an argument that

8     that is not his backpack?

9          MR. LEWIS:  We're not presenting any witnesses,

10    Your Honor.

11         THE COURT:  What?

12         MR. LEWIS:  We're not presenting any witnesses,

13    Your Honor.

14         THE COURT:  Are you stipulating to it?

15         MR. LEWIS:  I -- if they -- if they saw his car at

16    the Clackamas Inn, that's one thing, but all this other

17    stuff that's in that -- in counsel's argument, that is

18    extraneous.  If there's a notepad that says "Clackamas Inn"

19    and they see his car at the "Clackamas Inn," that's

20    different.  I don't -- I'm not arguing about that in itself.

21         THE COURT:  Okay.  I wouldn't think so.

22         MR. LEWIS:  But following him, surveilling him,

23    calling Officer Corona, the -- all these things that -- what

24    counsel calls a brief stop at 1057 Clayton Way, that drug

25    dealers often make brief stops, jurors can make an

1    inference, she says.

2        Again, that's far afield from having a notepad from

3    Clackamas Inn and seeing the car at Clackamas Inn.  Those

4    are two different things.

5            THE COURT:  I think that the government could be

6    in trouble on appeal to allow them the speculation that --

7    that drug dealers make frequent stops.  All the evidence you

8    have here is he made one stop.

9            MS. BOLSTAD:  And that's all I intend to present.

10   He made one.

11           THE COURT:  But that's -- so he made one stop.

12   Are you going to argue that this is what drug dealers do?

13           MS. BOLSTAD:  I'm going to argue that they did

14   watch him that day.  It goes to the work they did, and they

15   saw that he didn't go to work.  He didn't go to a job

16   location.  He made a brief stop at a house.

17           THE COURT:  Well, I think it's really skinny to

18   make that -- it's an inference of a drug deal because they

19   didn't get him up -- didn't make any search, didn't make

20   follow-up with anybody at that stop.  All we know is he

21   stopped, and I -- I think you've got so much already.  Why

22   mess it up -- mess it up?

23           MS. BOLSTAD:  It's this difficult burden of proof

24   we bear of beyond a reasonable doubt.  It makes me want to

25   present everything I have.

1          THE COURT:  What happened in your last case is the

2     jury was out there asking what distribution meant for Pete's

3     sake.

4          MS. BOLSTAD:  Exactly.  You see what I'm up

5     against.

6          THE COURT:  I do.  But I just don't want to get an

7     irrelevancy in here.

8          MS. BOLSTAD:  Here's what I'm willing to do:  I

9     will keep out of my case-of-chief evidence that he made a

10    brief stop, but I see this very easily getting the door

11    opened when the defense asks officers, "You had no other

12    indication he was dealing drugs," and they'll be inclined to

13    say --

14         THE COURT:  Well, if he ever did that, you would

15    certainly have a right.

16       But I've known Mr. Lewis a long time.  He tries his

17    cases with his elbows in.

18       Okay.  Anything else on the evidence?

19         MR. LEWIS:  Yes, Your Honor.  Item 6.  The Court

20    said it was willing to let them bring in the fact he was

21    arrested on a warrant.  I don't think that's even necessary.

22    They could say it was a traffic stop.  Counsel has

23    suggested, also, in her response, that this could be viewed

24    as a traffic stop.

25         THE COURT:  No, it's not a -- it's not a -- it's

1    not a "running a red light" traffic stop.  They have the

2    right to bring in a warrant.  You have the right to object

3    to that evidence.

4              MR. LEWIS:  Very well.

5              THE COURT:  Okay.

6              MR. LEWIS:  I have to comment, though, about this

7    difficult burden.  There aren't very many not guilty

8    verdicts in this district, and there's reasons for that, but

9    it's not --

10             THE COURT:  Well, there aren't very many verdicts

11   in this district.  There were 14 trials last year in the

12   whole district of Oregon.

13             MR. LEWIS:  Criminal and civil?  Criminal?

14             THE COURT:  Yeah.

15             MR. LEWIS:  Really.

16             THE COURT:  Yeah.  We're just not trying any

17   cases.

18             MR. LEWIS:  That's because they're so generous

19   with their plea offers, Judge.  It's not our fault.

20             THE COURT:  Okay.  As far as instructions are

21   concerned, they seem to be all boilerplate.  You have a

22   couple of amendments on the instructions.

23             MR. LEWIS:  Oh, I had a special instruction for

24   reasonable doubt.  I would -- I would ask that -- I didn't

25   put this in my -- I don't think I did a search and replace,

but I would prefer that Mr. Johnson be referred to as

"Mr. Johnson" and not "the defendant, the defendant, the

defendant, the defendant."

        THE COURT:  You can call him "Mr. Johnson."  She

can call him "the defendant."

        MR. LEWIS:  I understand that.  But I think when

the Court is instructing the jury, that's what I'm referring

to.

        THE COURT:  Well, I will consider that.

        MR. LEWIS:  The other thing, Judge, I realized

yesterday when I was looking at the indictment again -- I

didn't file anything -- and I can't recall -- because there

are so few trials, I can't recall if the jurors are handed a

copy of the indictment.  If they are, I would ask that the

reference to EKJ be excessed because the indictment says

"Mark Johnson, aka" --

        THE COURT:  They may -- you just provide us a

redacted copy of what you want.

        MR. LEWIS:  I'll do that.  Yes, Your Honor.

        THE COURT:  That's fine.  So to remind you, I

always instruct before argument.  And so when you're arguing

the case you can -- you can blow up the instructions, you

can do whatever.  You can read them.  You can tell the

jurors, who will each have a copy, turn to number so and so.

This will make sure that they get the right copy.

1        Right, Counsel?

2              MS. BOLSTAD:  Yes.

3              MR. LEWIS:  Having been a juror before in a

4    complex case, I think that's very helpful.

5              THE COURT:  Yeah, I always have, for years.

6        The other thing is I give the preliminary instructions

7    with the elements that they have to find and the definition

8    of the elements right at the beginning, as well as a copy of

9    the verdict form, so they know what they have to find.  They

10   know what the charges are.  So they virtually get the whole

11   essence of the case at the beginning.

12       And as far as opening statement is concerned, you can

13   use any exhibits that we have preadmitted on either side.

14   Use them, blow them up, whatever you want, during your

15   opening statements.

16       The -- as far as the exhibits are concerned, have you

17   agreed on the exhibits?

18             MR. LEWIS:  Judge, I received -- I think I got

19   them emailed to me -- was it yesterday?

20             MS. BOLSTAD:  (Nodding.)

21             MR. LEWIS:  We both have been very busy, and I

22   was.

23             THE COURT:  I didn't see anything in there that.

24             MR. LEWIS:  I've not had a chance to look at them.

25             THE COURT:  There are quite a few blanks because

1   they're physical exhibits.  You've seen them, but they'll

2   bring in --

3           MR. LEWIS:  Your Honor, we have no object to the

4   blanks.

5           THE COURT:  Okay.  Because that's the cell phone

6   and the knives and that sort of thing.  The rest are just

7   photographs.

8           MR. LEWIS:  I'll take a look -- I'll try to do

9   that today.  And if there's any issue, I can alert counsel.

10          THE COURT:  If you think of anything else you want

11  to cover, just give us a call.

12          MR. LEWIS:  I have one question for the Court.

13      Counsel knows this, because her memory is very fresh on

14  this.  I don't know the Court's procedure for voir dire.  I

15  watched a little bit of it on the *Gill* case.

16          THE COURT:  I do the life sketch of each of the

17  jurors, and you can ask any questions you want afterwards.

18          MR. LEWIS:  And as far as peremptory challenges --

19          THE COURT:  We do them out -- we send the jurors

20  out.  We'll have 35 jurors, I think.  You get 10.  They get

21  six.  So you'll know the -- I -- sometimes I have all of the

22  jurors, the 12, plus the preemptory, 16, give their life

23  sketch, but I didn't last time, I don't think so.  Did we?

24          THE LAW CLERK:  You did all of them.

25          THE COURT:  I did all of them, so I'll do all of

1    them again.  It goes very rapidly.

2        So you know who's here, so you can decide if -- you

3    have a choice, then, to make an intelligent choice, then, if

4    we drop somebody, who are you going to get?  So then we'll

5    do that.

6            MR. LEWIS:  So the -- so the Court deals with the

7    peremptories here in the courtroom with the jurors out?

8            THE COURT:  The jurors are out.  We hand you, each

9    side, a slip, and you give us your peremptories.  And we

10   have no dupes.  We take the first 12.  We have a very brief

11   trial.  Probably a day, a day and a half.  We're in no

12   hurry.  I want to make that clear.  Take all the time you

13   want.

14       So that's about it.

15       Actually, I become totally irrelevant, because the --

16   we rarely have an objection after we've gone through what

17   we've gone through.  You know what's covered, what will be.

18   You want to make any objections to protect your client's

19   interests, of course, but without argument.  I never hold a

20   sidebar conference.  If you want to be heard outside the

21   presence of the jury, just ask, and we'll send them out.

22       Anyway, it's supposed to be -- I look forward to the

23   trial, and I hope we'll have a good one.  Thank you.

24           MS. BOLSTAD:  Your Honor, I have matters.

25           THE COURT:  Yes.

1      MS. BOLSTAD:  I filed motions in limine, and it's

2  document 50.

3      THE COURT:  Oh, what is that?

4      MS. BOLSTAD:  There's three motions in limine.

5  Only two matters.  The third one is moot.  The first motion

6  in limine is to exclude reference to potential punishment.

7  I don't --

8      THE COURT:  Well, I -- you don't want that in an

9  instruction?

10      MS. BOLSTAD:  I just want it to be a motion in

11  limine that neither party is allowed to refer to potential

12  punishment.

13      THE COURT:  Oh, well, that would be -- yes, that's

14  not an appropriate argument, and I would give an institution

15  to that effect.

16      MS. BOLSTAD:  Okay.  And my second motion in

17  limine -- I've learned my lesson, after three trials this

18  year, that I need to actually move for this to be a ruling

19  pretrial, to exclude argument that the government is

20  wiretapping every American.  I've heard that in every case

21  I've had this year.

22      THE COURT:  Really?

23      MS. BOLSTAD:  Yes.

24      THE COURT:  Did we have it?

25      MS. BOLSTAD:  Yes.  In two trials.

1          THE COURT:  I don't remember that.

2          MS. BOLSTAD:  It's from closing argument.  Any

3    time there's a cell phone used in a criminal case these

4    days, the closing argument of defense tries to scare people

5    that "All of you, your phones are being tapped right now,"

6    and I just -- there's no evidence in trial of that, so I'd

7    move to exclude it pretrial.

8          THE COURT:  I never even -- I didn't recognize

9    that it happened, but if it did, I don't think that would be

10   appropriate.

11         MR. LEWIS:  Judge, I have not heard of it either,

12   but I have to thank counsel for suggesting that it might be

13   trendy.  I took that as a real compliment, and I appreciate

14   that.  I've never heard of this argument.

15         MS. BOLSTAD:  The man's in a bow tie, Your Honor.

16   He's very trendy.  Look at him.

17         MR. LEWIS:  And suspenders.

18         THE COURT:  Okay.  You won't refer to that.

19         MR. LEWIS:  I have no intention of referring to

20   punishment or widespread government intrusion or anything

21   else.

22         THE COURT:  Okay.  I think we've got a nice clean

23   trial.

24         MS. BOLSTAD:  Yes.

25         THE COURT:  I look forward to it.  Court is in

 1   recess.

 2              MS. BOLSTAD:  Thank you.

 3              MR. LEWIS:  Thank you.

 4                      (Hearing concluded.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA,           )

4                        Plaintiff,  )Case No. 3:14-cr-00224-JO
                                         )
5                        v.              )
                                         )
6   MARK PATRICK JOHNSON,         ,      )
                                         )
7                        Defendant.  )
    _____)

8

9                        MOTION HEARING

10                      December 4, 2014

11

12          I certify, by signing below, that the foregoing is

13   a true and correct transcript of the record of proceedings

14   in the above-entitled cause.  A transcript without an

15   original signature, conformed signature, or digitally signed

16   signature is not certified.

17

18   /s/Jill L. Erwin, CSR, RMR, RDR, CRR
    _____
19
    Official Court Reporter           Date: December 15, 2014
20

21

22

23

24

25